Avraham SHIFRIN et al., Plaintiffs,

v.

Jerry WILSON et al., Defendants and Third-Party Plaintiffs,

v.

Raphael PERL, Third-Party Defendant.

Civ. A. No. 74–259.

United States District Court, District of Columbia.

March 9, 1976.

Supplemental Opinion May 12, 1976.

ington Area Peace Action Coalition and a member of the Executive Committee of the Washington Area Impeachment Coalition. Defendants are the District of Columbia, the Corporation Counsel for the District, certain assistants to the Corporation Counsel, the Chief of Police for the District, and three other members of the Metropolitan Police Department. As more fully explained below, the case is currently before the Court on a variety of cross-motions for summary judgment as to certain defendants and related aspects of the case.

The incident which gave rise to the case at bar took place in the District of Columbia nearly three years ago: plaintiff Shifrin had planned to deliver a public address in front of the Russian Embassy on February 9, 1973, but his presentation was curtailed when members of the Metropolitan Police Department arrested him for violation of Article II, § 3 of the Police Regulations of the District of Columbia, which requires that a permit be obtained from the Chief of Police in order to deliver any speech in a public space in the District. As a result of this incident, plaintiffs Shifrin and Bloom brought this suit seeking: a) a declaration that the regulation in question is unconstitutional, and b) related injunctive relief. Plaintiff Shifrin also seeks money damages for the alleged deprivation by defendants of his first, fourth and fifth amendment rights. Jurisdiction in this case is provided by 28 U.S.C. § 1331(a).[1]

Stephen M. Truitt, Leonard S. Spector, James H. Stark, Washington, D. C., for plaintiffs; Ralph J. Temple, Washington, D. C., of counsel.

C. Francis Murphy, Corp. Counsel, John A. Earnest, Thomas R. Nedrich, Asst. Corp. Counsels, Washington, D. C., for defendants.

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

### I. *Background*

The instant action is brought by plaintiffs Avraham Shifrin, a citizen of the State of Israel, and Abraham Bloom, who was, at the time of the filing of the amended complaint in this case, Chairman of the Wash-

The essential facts are as follows: On February 9, 1973, at approximately 4:00 p. m., plaintiff Shifrin went to the Soviet Embassy near Sixteenth and M Streets N. W.,

---

1. See *Apton v. Wilson,* 165 U.S.App.D.C. 22, 506 F.2d 83, 95–96 (1974); *Hartigh v. Latin,* 158 U.S.App.D.C. 289, 485 F.2d 1068 (1973). Defendants have not challenged plaintiffs' allegation of the requisite jurisdictional amount. In these circumstances, the Court finds the reasoning of *Apton, supra,* applicable: "While the allegations of the complaint are not conclusive the court must meet a stringent standard to support a finding that the amount in controversy is not satisfied. It must find 'to a legal certainty that the claim is really for less than the jurisdictional amount.' [citation omitted]

The District of Columbia defendants do not dispute the amount in controversy. It appears that the allegation of jurisdictional amount is supported by a claim that is substantial enough, at least on its face, to satisfy the provisions of § 1331(a)." This Court has reached a similar conclusion in the instant case. Plaintiffs have made an allegation of jurisdictional amount—$25,000 in punitive damages and $25,000 in compensatory damages—sufficient on its face to satisfy the requirements of § 1331(a).

in the District of Columbia for the purpose of delivering an address to persons assembled in front of the Embassy. Shifrin planned to speak on the topic of the conditions in Soviet prison camps, in several of which he had been incarcerated for ten years. Also present at the Embassy at that time was a detail of officers from the Metropolitan Police Department (MPD) under the command of defendant Captain J. C. Connor. The detail had been dispatched to the scene to monitor the anticipated activities. Before Shifrin began to speak, defendant Connor informed him and his attorney Raphael Perl that Mr. Shifrin could not give a speech without a permit as required by Article II, § 3 of the police regulations.[2] Connor handed a copy of the regulation in question to Shifrin and Perl, and further discussion ensued. Shifrin eventually decided to ignore Connor's admonition and attempted to deliver his speech. As a result he was placed under arrest, escorted to a nearby scout car without incident and taken to the Second Police District, where, within about one hour, he was processed and released upon posting of ten dollars collateral. On March 20, 1973, the Office of the Corporation Counsel of the District of Columbia dropped all charges against Shifrin. The next day, March 21, 1973, the Corporation Counsel issued a legal opinion in which Article II, § 3 was found to be too broad to withstand first amendment challenge.

The issuance of the opinion of the Corporation Counsel was the culmination of another series of events which is also important to the case at bar. This chain of events began on December 8, 1971, when, in the case of *A Quaker Action Group v. Wilson*, C.A. No. 70–2915 (D.D.C.), Judge Gesell held Article VI, §§ 1 and 3 of the police regulations to be unconstitutional. Based on the reasoning in Judge Gesell's opinion, a conclusion was reached among attorneys in

the office of the General Counsel of the MPD that the regulation at issue in the instant case (hereinafter, the "speech regulation") was also likely to be held unconstitutional, if challenged. Accordingly, on May 1, 1972, the Deputy General Counsel of the MPD, Kenneth Crosson, requested an opinion from the defendant Corporation Counsel as to the constitutionality of the speech regulation. The request was originally routed to Assistant Corporation Counsel Gilbert Gimble; then, before Gimble had done any work on the request, it was rerouted in September of 1972 to Assistant Corporation Counsel David Eisenberg. The latter did not perform any work on the request until early March, 1973. Upon completing a draft of an opinion shortly thereafter, Eisenberg forwarded the draft to defendant Murphy, the Corporation Counsel, on March 14, 1973. Murphy revised the opinion and issued it, as previously mentioned, on March 21, 1973. On April 10, 1973, defendant Police Chief Jerry Wilson issued an MPD circular instructing all officers that, in accordance with the Corporation Counsel's opinion, the speech regulation was no longer to be enforced.

As mentioned above, both plaintiffs seek declaratory and injunctive relief with respect to the speech regulation, and plaintiff Shifrin also seeks damages for deprivation of his first, fourth and fifth amendment rights. The gravamen of Shifrin's complaint against the MPD officers is that they either knew or had a responsibility to know that the speech regulation was, under a long line of judicial precedent, unconstitutional, and that the arrest of Shifrin pursuant to the regulation was therefore unlawful and a deprivation of his constitutional rights. Shifrin's complaint against defendant Wilson is that he failed to use his powers to prevent enforcement of the regulation while the request for an opinion from the Corporation Counsel was pending, and

---

2. Article II, § 3 provides:

"No person shall be permitted to make or deliver any address, speech, or sermon upon any subject whatsoever, in or upon any street, avenue, alley, footway, highway, or other public space in the District of Columbia without first obtaining a permit in writing from the Chief of Police so to do, which permit shall designate the time and precise locality where such address, speech, or sermon may be given."

he likewise failed to expedite the issuance of the opinion, all despite the fact that he knew the regulation was likely to be viewed as unconstitutional by the Corporation Counsel. Shifrin alleges that these failures led directly to his arrest and, therefore, a deprivation of his constitutional rights. Shifrin's complaint against defendant Murphy and members of his office is that their negligence in the conduct of their duties caused an unreasonable delay from the time an opinion on the speech regulation was first requested (May, 1972) until the time that it was issued (March, 1973). That negligence, according to Shifrin, also led directly to a deprivation of his constitutional rights. Finally, Shifrin charges the District of Columbia with direct liability for the alleged deprivation of his constitutional rights because of its failure to properly supervise its employees, and with vicarious liability for the wrongs of its employees.

In the motions currently before the Court, plaintiffs have moved for summary judgment against the District on their claim for declaratory judgment and injunctive relief and for partial summary judgment against defendants Wilson, Murphy, and the District on the issue of the liability of each for the alleged unlawful deprivation of Shifrin's constitutional rights. Defendants have moved for summary judgment in favor of defendants Connor, Wilson, Murphy, and the District. For the reasons which follow, this Court grants declaratory relief, denies injunctive relief, and denies all motions for summary judgment.

## II. *The Constitutional Issues*

The linchpin of plaintiffs' action is their contention that the speech regulation in question is clearly unconstitutional under a long line of Supreme Court authority. Before turning to the merits of that contention, this Court must consider several preliminary matters.

*A. There is no necessity for a three-judge court.*

Under 28 U.S.C. § 2281, a three-judge court must be convened when a litigant challenges on constitutional grounds and seeks injunctive relief against enforcement of a state statute or an administrative order issued pursuant to such a statute. Under 28 U.S.C. § 2282, a three-judge court is also required for a challenge to an act of Congress on constitutional grounds in which injunctive relief against the enforcement of the act is sought. While none of the parties have requested a three-judge court in this case, in which a speech regulation is challenged on constitutional grounds and an injunction against its enforcement is requested, it is nonetheless the Court's duty to consider whether 28 U.S.C. § 2281 or 28 U.S.C. § 2282 applies, since the three-judge court acts are jurisdictional. *McLucas v. DeChamplain,* 421 U.S. 21, 28, 95 S.Ct. 1365, 1370, 43 L.Ed.2d 699, 707 (1975).

In order to determine whether a three-judge court is required in the instant case, it is first necessary to determine whether the District of Columbia police regulation at issue was promulgated pursuant to a "state" statute or to an act of Congress. The distinction is important, for, while an administrative order of statewide effect promulgated pursuant to a state statute is subject to 28 U.S.C. § 2281,[3] an order promulgated pursuant to an act of Congress is not subject to the three-judge court requirement of 28 U.S.C. § 2282 unless the constitutional challenge to such an order also goes to the validity of the act itself. *National Student Association v. Hershey,* 134 U.S.App.D.C. 56, 412 F.2d 1103, 1124 n. 56 (1969); *Hoffman v. Department of H. U. D.,* 519 F.2d 1160, 1163–64 (5th Cir. 1975); *see generally William Jameson & Co. v. Morganthau,* 307 U.S. 171, 173–74, 59 S.Ct. 804, 805, 83 L.Ed. 1189, 1192 (1939). At the time pertinent to the case at bar, the District of Columbia Council had the authority, pursuant to 1 D.C.Code § 224 to make and modify police regulations for the MPD.[4]

---

3. *Bd. of Regents v. New Left Educ. Project,* 404 U.S. 541, 542–43, 92 S.Ct. 652, 653, 30 L.Ed.2d 697, 699–700 (1972).

4. Before 1967, the power to make, modify and enforce police regulations had been vested by Congress in the Board of Commissioners of the District of Columbia. In Reorganization Plan No. 3 of 1967, 1 D.C.Code Ann.App. (1973),

Case law has established the proposition that District of Columbia Code provisions are acts of Congress and not state statutes for purposes of the three-judge court acts, and that 28 U.S.C. § 2282 is therefore the applicable three-judge court provision in cases involving D.C.Code statutes. *Shapiro v. Thompson,* 394 U.S. 618, 625 n. 4, 89 S.Ct. 1322, 1326, 22 L.Ed.2d 600, 609 (1969); *Police Officers Guild v. Washington,* 369 F.Supp. 543, 549–50 (three-judge court, D.D.C.1973); *see Doe v. Martin,* 404 F.Supp. 753 (three-judge court, D.D.C.1975); *Doe v. Martin, supra,* C.A. No. 75–0083, (D.D.C., three-judge court Notice of Jan. 30, 1975).[5] The regulation at issue is not itself an "act of Congress," but was promulgated pursuant to such an act. 1 D.C.Code Ann. § 224 (1973). It is, accordingly, not subject to the requirements of 28 U.S.C. § 2282. *National Student Association, supra; Keyes v. Mad-*

Congress created the office of the Commissioner of the District of Columbia and the District of Columbia Council. In § 402(1) of the Reorganization Plan, Congress transferred the power to make and modify police regulations to the Council; in § 401, Congress transferred the power to enforce the regulations to the Commissioner. The scheme remains largely the same to this day: under the District of Columbia Self-Government and Governmental Reorganization Act, Pub.L.No.93–198, 87 Stat. 774 (1973), the office of the Commissioner and the District of Columbia Council were abolished and replaced by the office of the Mayor and the Council of the District of Columbia, and the functions of the former institutions were transferred to the latter. See 1 D.C.Code Ann. §§ 131, 141, 144, 161, 162 (Supp. II, 1975).

5. Some courts which have considered this problem and found that D.C.Code statutes are acts of Congress within the meaning of 28 U.S.C. § 2282 have raised the possibility that the same statutes might *also* be state statutes within the meaning of 28 U.S.C. § 2281. *Police Officers Guild v. Washington,* 369 F.Supp. 543, 549 (three-judge court, D.D.C.1973); *Harrell v. Tobriner,* 279 F.Supp. 22, 24–25 n. 6 (three-judge court, D.D.C.1967), aff'd sub nom. *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); *see Jeannette Rankin Brigade v. Chief of Capitol Police,* 342 F.Supp. 575, 580 n. 8 (three-judge court, D.D.C.1972). The validity of such an interpretation would seem to have been placed in doubt, however, by language in the Supreme Court decision of

*sen,* 86 U.S.App.D.C. 24, 179 F.2d 40, 43 (1949), *cert. denied,* 339 U.S. 928, 70 S.Ct. 628, 94 L.Ed. 1349 (1950); *see A Quaker Action Group v. Wilson,* C.A. No. 70–2915 (D.D.C. Dec. 8, 1971).[6]

## B. The constitutional question is not moot; plaintiffs possess the requisite standing to maintain this action.

 Defendants allege that plaintiff's request for declaratory and injunctive relief is moot because defendant Wilson has already distributed a circular instructing MPD officers that, in light of the Corporation Counsel's opinion on the speech regulation, the regulation should no longer be enforced. The test for determining mootness which defendants must meet is whether there is any "reasonable expectation that the wrong will be repeated." *United States v. W. T. Grant Co.,* 345 U.S. 629, 633, 73

*Palmore v. United States,* 411 U.S. 389, 395, 93 S.Ct. 1670, 1675, 36 L.Ed.2d 342, 350 (1973), "A reference to 'state statutes' would ordinarily not include provisions of the District of Columbia Code, which was enacted, not by a state legislature, but by Congress . . . .." After noting that Congress can easily provide for treatment of District of Columbia statutes as state statutes and that it has in fact done so in individual cases, 411 U.S. at 395 n. 5, 93 S.Ct. at 1675, 36 L.Ed.2d at 350, the Court went on to hold that in the absence of such an indication, "[j]urisdictional statutes are to be construed 'with precision and with fidelity to the terms by which Congress has expressed its wishes . . . .'" 411 U.S. at 396, 93 S.Ct. at 1675, 36 L.Ed.2d at 350. Although the jurisdictional statute at issue in *Palmore* was not the three-judge court act, the principles of *Palmore* would seem to have direct application to the instant case.

6. In light of the Court's disposition of the three-judge court issue above, it is unnecessary to reach the question of whether the challenge to the police regulation would in any case not come within the ambit of the three-judge court statutes because of an absence in the instant case of a substantial constitutional question. See *Goosby v. Osser,* 409 U.S. 512, 93 S.Ct. 854, 35 L.Ed.2d 36 (1972). However, considering the Court's decision on the merits of the constitutional claim, *infra,* there would appear to be some likelihood that, if forced to decide, this Court would have found that a substantial

S.Ct. 894, 897, 97 L.Ed. 1303, 1309 (1953).[7] The Court has concluded that defendants have not met their burden.

The Court turns first to the case of *Machado v. Department of Health and Rehabilitative Services,* 357 F.Supp. 890 (three-judge court, S.D.Fla.1973). In *Machado,* plaintiffs challenged the constitutionality of a certain state statute. Defendants claimed that plaintiffs' application for declaratory and injunctive relief was moot because: a) an identically-worded subsection of another statute had already been held unconstitutional in an earlier case; b) the statute in question had not been invoked since that time; and c) the statute was regarded by state government officials as a "dead letter." The court held that since the provision in question was clearly unconstitutional, "we should eliminate the possibility of it being used [in the future]." 357 F.Supp. at 892. "[T]he statute has not been repealed; the 'public interest' requires the Court to lay to rest any 'continuing force' the statute possesses." *Id.* at 893.

The facts of the instant action present a much stronger case than *Machado* for declining to find plaintiffs' request for declaratory and injunctive relief moot. Plaintiffs have pointed out that, although the regulation is no longer being enforced by the MPD, it remains available to several federal law enforcement agencies authorized to enforce local police regulations. See 3 U.S.C. § 202 (Executive Protective Service); 40 U.S.C. § 193t (special police for the Smithsonian Institution and National Gallery of Art); 36 C.F.R. §§ 50.3(a), 50.5(c) (National Park Police). Defendants have not responded to plaintiffs' point, and the Court

can only assume that no policy against the enforcement of the speech regulation has been formulated by officials of the federal law enforcement agencies involved. Thus, in accordance with the *Machado* reasoning and especially in light of the apparent continued vitality of the regulation, the Court finds that plaintiffs' request for declaratory and injunctive relief is not moot.[8]

But even if this Court declined to accept the reasoning set forth above, there is another independent compelling reason why the request for declaratory and injunctive relief is not moot. Shifrin's damages claim is contingent upon a finding by the Court that the speech regulation is unconstitutional; for, the crux of Shifrin's damages allegations is that the various defendants were responsible for the enforcement of an unconstitutional regulation and, thereby, a deprivation of his constitutional rights. Shifrin's situation is therefore much like that of former Congressman Adam Clayton Powell in the case of *Powell v. McCormack,* 395 U. S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). In *Powell,* plaintiff sued for various forms of relief, including a declaration that Congress had acted in an unconstitutional manner in failing to seat him as a member of the 90th Congress. By the time the case reached the Supreme Court, the 90th Congress had terminated and Powell had been seated as a member of the 91st Congress. While this turn of events rendered certain aspects of his case moot, live issues remained, including whether Powell was entitled to back pay for Congress' allegedly unconstitutional action in excluding him. A determination of his entitlement to back pay was obviously contingent upon a determination of the constitutionality of Con-

---

constitutional question was not presented in the instant case.

**7.** The *Grant* case involved private, not governmental, activity. Nonetheless, although "[t]he search for continuing impact or probable recurrence . . . may be complicated by the official character of the challenged activity . . . the task of prediction is essentially similar to the task of predicting recurrence of discontinued private activity." 13 *Wright, Miller, and Cooper, Federal Practice and Procedure* § 3533, at 285 (1975).

**8.** In finding that defendants have failed to demonstrate that there is no reasonable expectation the wrong will be repeated, the Court also notes that if the regulation were to be invoked again there is certainly no assurance that timely judicial relief could be obtained to prevent irreparable infringement of the right of free speech which is affected by this regulation and is often asserted in a spontaneous manner. *See Jeannette Rankin Brigade v. Chief of Capitol Police,* 137 U.S.App.D.C. 155, 421 F.2d 1090, 1092 (1969).

gress' action; the Supreme Court therefore decided the constitutional issue. In the same manner, this Court must decide the constitutional issue in order to make possible a decision on Shifrin's damages claim.

The same quality which makes this case a "live" controversy also provides sufficient standing for plaintiff Shifrin to seek declaratory and injunctive relief; it seems axiomatic that if Shifrin's claim for damages is contingent upon a finding that the regulation in question is unconstitutional, he has standing to maintain a challenge to that regulation. Accordingly, it is unnecessary for this Court to reach at this time the issue raised by defendants of Bloom's standing to maintain the request for declaratory and injunctive relief.[9]

*C. The speech regulation is unconstitutional.*

 In *A Quaker Action Group v. Wilson,* C.A. No. 70–2915 (D.D.C. Dec. 8, 1971), Judge Gesell held unconstitutional certain District of Columbia police regulations which prohibited the use of sound amplification equipment in public places without a permit obtained from the Chief of Police. Judge Gesell found the regulations facially invalid because "they contain absolutely no standards for this exercise of police discretion." In striking down the sound amplification regulations, Judge Gesell acted in accordance with a long line of Supreme Court authority establishing the proposition that "a law subjecting the exer-

cise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional [on its face]." *Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 150–51, 89 S.Ct. 935, 938, 22 L.Ed.2d 162, 167 (1969); see also, *e. g., Staub v. City of Baxley,* 355 U.S. 313, 78 S.Ct. 277, 2 L.Ed.2d 302 (1958); *Niemotko v. Maryland,* 340 U.S. 268, 71 S.Ct. 325, 95 L.Ed. 267, 280 (1951); *Saia v. New York,* 334 U.S. 558, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948); *Schneider v. State,* 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939); *Hague v. CIO,* 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939); *Shuttlesworth, supra,* 394 U.S. at 151 n. 2, 89 S.Ct. at 938, 22 L.Ed.2d at 167 (collecting cases); *OD v. Wilson,* 323 F.Supp. 76 (three-judge court, D.D.C.1971). As one commentator has noted:

> "Within this framework, the major doctrine that bears upon the form of permit systems stems from the rules against vagueness and overbreadth. It holds that the standards by which a permit is to be granted, denied, or shaped must be sufficiently detailed and specific so that the officials administering the system are not given uncontrollable authority. The Supreme Court laid down this rule in *Lovell v. Griffin,* the first case in which it considered a permit system, and has reiterated it on numerous occasions . . . ."
> T. Emerson, *The System of Freedom of Expression* 372 (1970).

The regulation at issue in the instant case [10] suffers from the same paucity of standards

**9.** If circumstances were different and Shifrin did not have standing by virtue of his damages claim, the plaintiffs would have to show not only that there was a reasonable expectation that the wrong in question would be repeated, but also that such a recurrence would affect them. *Wright, Miller, and Cooper, Federal Practice and Procedure* § 3533, at 285 (1975). Plaintiff Bloom met the initial burden of this requirement by alleging in the complaint that he is associated with various organizations which frequently exercise the rights of free speech and assembly in public places. Defendant, however, demanded strict proof of these allegations. Despite the fact that the only part of the case involving Bloom—the request for declaratory and injunctive relief—has been placed before the Court, plaintiff has yet to

offer proof of his standing allegations. The Court will allow Bloom time to so act; if he fails to do so, or if defendants subsequently show Bloom's proof of standing to be insufficient, the Court will dismiss plaintiff Bloom from this action.

**10.** For the full text of the regulation at issue, see note 2, *supra.* The only significant difference between the speech regulation and the sound amplification regulations overturned by Judge Gesell in *A Quaker Action Group v. Wilson,* C.A. No. 70–2915 (D.D.C. Dec. 8, 1971), is that the activity proscribed by the instant regulation—speech—is entitled to, if anything, even more protection than the activity proscribed by the sound amplification regulations.

which has proved fatal to the provisions overturned by the Supreme Court in the cases cited above. It therefore deserves to be likewise condemned.[11]

▮ Defendants do not argue with the basic proposition asserted by plaintiffs and contained in the Supreme Court cases cited above. Defendants suggest, however, that this Court could and should salvage this regulation by giving it a narrow construction which would uphold its constitutionality. In support of their position, defendants draw the Court's attention to the case of *District of Columbia v. Edgcomb*, 305 A.2d 506 (D.C.App.1973), in which the District of Columbia Court of Appeals rendered a saving construction to a local traffic regulation involving processions and parades.

To be sure, statutes should be construed, whenever possible, so as to uphold their constitutionality. *United States v. Vuitch*, 402 U.S. 62, 68, 91 S.Ct. 1294, 1297, 28 L.Ed.2d 601, 607 (1971). "But there are bounds beyond which it is not appropriate for courts to go in this regard, at least without exposing themselves to the charge that they are usurping the legislative function." *Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F.Supp. 575, 587 (three-judge court, D.D.C.1972). In the instant case, if this Court were to create the missing standards out of whole cloth, it would obviously be engaging in a function properly left to lawmakers.[12] *See A Quaker Action Group v. Wilson, supra.* The situation might be different if this Court had the benefit of a prior narrowing construction of the regulation by the local courts, similar perhaps to the construction of the traffic regulation rendered by the District of Columbia Court of Appeals in *Edgcomb, supra.* Compare *Cox v. New Hampshire*, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941) and *Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), *with Brandenburg v. Ohio*, 395 U.S. 444, 449 n. 3, 89 S.Ct. 1827, 1830, 23 L.Ed.2d 430, 434 (1969). But the regulation has not, to the Court's knowledge, been interpreted by the District of Columbia courts. In any case, this Court would be reluctant to save a regulation which restricts "pure speech," i.e. rights entitled to more protection than those restricted by the provisions at issue in, for example, *Edgcomb, supra,* and *Cox, supra.* See *Cox, supra,* 312 U.S. at 573, 61 S.Ct. at 764, 85 L.Ed. at 1052.

For all of the above reasons, the Court declines to render a saving construction and instead will issue a declaratory judgment of even date herewith finding the regulation facially unconstitutional.[13]

*D. Injunctive relief would be inappropriate in the instant case.*

▮ As demonstrated above, this Court does not view the controversy over the constitutionality of the regulation as moot.

---

11. Defendants suggest that Shifrin's own conduct should work as an estoppel in his challenge to the regulation. Specifically, they allege that he was warned by his attorney and by defendant Connor that he ran the risk of arrest if he went on with his speech. Assuming *arguendo* the truth of defendants' allegations, they are immaterial; for, as the Supreme Court has ruled: "A person faced with such an unconstitutional licensing law may ignore it and engage with impunity in the exercise of the right of free expression for which the law purports to require a license." *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 151, 89 S.Ct. 935, 939, 22 L.Ed.2d 162, 167 (1969); see also *Pierson v. Ray*, 386 U.S. 547, 558, 87 S.Ct. 1213, 1219, 18 L.Ed.2d 288, 296 (1967).

12. The task of providing standards for the regulation in question would be made all the more difficult because the activities proscribed by the regulation—speeches, sermons, and addresses—are often engaged in spontaneously. See note 8, *supra.* Moreover, the provision's status as a police regulation would be of little aid to the Court in attempting a "saving construction;" in contrast, the status of the *traffic* regulation involved in *District of Columbia v. Edgcomb*, 305 A.2d 506 (D.C.App.1973) gave that court insight into the implicit purpose of the regulation. 305 A.2d at 511.

13. The Court views as highly convincing the opinion of the Corporation Counsel of March 21, 1973, reaching the same conclusion as to the constitutional deficiency of the regulation. See Exhibit 1 to plaintiffs' motion for summary judgment.

However, the fact that the regulation is not being enforced by the MPD mitigates against issuing injunctive relief at this time. As Chief Judge Bazelon noted in declining to issue an injunction in similar circumstances: "[R]espect for the integrity of a coordinate branch of government argues for judicial restraint." *National Student Association v. Hershey*, 134 U.S.App. D.C. 56, 412 F.2d 1103, 1124 (1969). The Supreme Court has expressed similar sentiments in upholding a district court's decision to withhold injunctive relief after it found a state statute unconstitutional: "[T]he District Court properly refused to issue the injunction; for there was 'no allegation here and no proof that respondents would not, . . . acquiesce in the decision . . . holding the challenged ordinance unconstitutional.'" *Poe v. Gerstein*, 417 U.S. 281, 281–82, 94 S.Ct. 2247, 2248, 41 L.Ed.2d 70, 71 (1974). This Court assumes that defendants' acquiescence in the instant case will include taking appropriate steps to inform all law enforcement officers who might otherwise invoke the regulation of this Court's decision.

### III. *Liability of Defendant Connor*

The issue of the liability of defendant John Connor, who was an MPD captain at the time of the occurrence of the events which gave rise to this action, is currently before the Court on defendant's motion for summary judgment. Plaintiffs have not filed a cross motion for summary judgment as to Connor; rather, they merely oppose granting summary judgment.

The statements of facts, affidavits, depositions, and other submissions by the parties reveal that it was Connor who decided to invoke the speech regulation. When plaintiff Shifrin failed to produce a permit and proceeded with his address, Connor ordered one of the officers in his detail to arrest Shifrin.

The gist of plaintiffs' complaint against Connor is that he either knew or should have known that the speech regulation was unconstitutional under a long line of Supreme Court authority. Consequently, plaintiffs argue, Connor's actions constituted an unwarranted deprivation of Shifrin's first, fourth, and fifth amendment rights, a deprivation for which Connor may be held civilly liable.

■ In determining whether Connor may be held liable, the Court is guided by the Supreme Court's discussion in *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), of standards of liability applicable to arresting police officers. *Pierson* was a case brought under § 1 of the Civil Rights Act of 1871, 42 U.S.C. § 1983, which essentially holds civilly liable any person who, under color of state law, deprives another person of his or her rights secured by the laws and Constitution of the United States. *Pierson* arose out of an arrest of the plaintiff pursuant to a state statute subsequently held to be unconstitutional. The Court noted that at common law an arresting officer could not be held liable for arrests made in good faith and with probable cause. While the Supreme Court was not obligated to apply common law defenses in actions arising under 42 U.S.C. § 1983, since the purpose of that statute was to protect federally-created rights from infringement by the states,[14] the Court nonetheless found suitable and therefore adopted the good faith-probable cause defense for suits against arresting officers under § 1983.

In *Bivens v. Six Unknown Named Agents of FBI*, 456 F.2d 1339 (2d Cir. 1972) ("*Bivens* II"), the court applied the *Pierson* standard in a case arising, not under 42

---

14. "There is no doubt that the federal courts do have the *power* to fashion privilege rules that differ from those of the common law in actions against police officers which arise under federal law, if they determine that the Constitution would thereby be better served." Theis, *"Good Faith" as a Defense to Suits for Police Deprivations of Individual Rights*, 59 Minn.L.Rev. 991, 1025 (1975).

See also *District of Columbia v. Carter*, 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973); *Carter v. Carlson*, 144 U.S.App.D.C. 388, 447 F.2d 358 (1971), *rev'd on other grounds sub nom. District of Columbia v. Carter*, supra; *Hampton v. City of Chicago*, 484 F.2d 602, 607–08 (7th Cir. 1973) (Stevens, J.).

U.S.C. § 1983, but rather, as in the instant case, under 28 U.S.C. § 1331 and the Constitution itself. The court reasoned that it would be "incongruous and confusing" to apply different standards of liability and immunity in analogous actions. 456 F.2d at 1346–47. The Court also elaborated upon the meaning of the "probable cause" prong of the standard:

> "[T]he police officer need not allege and prove probable cause in the constitutional sense. . . . [He] must allege and prove . . . that he believed, in good faith, that his conduct was lawful [and] that his belief was reasonable. And so we hold that it is a defense to allege and prove good faith and reasonable belief in the validity of the arrest . . .." 456 F.2d at 1348.

▮▮▮ At least one court in this district has adopted the *Bivens* II formulation and applied it in an action arising under 28 U.S.C. § 1331. *Tatum v. Morton,* 402 F.Supp. 719 (D.D.C.1974). It is clear to this Court that the "good faith-reasonable belief" test is to be applied in cases such as the instant action, and the Court will accordingly apply that standard in ruling upon defendant Connor's motion for summary judgment. Since "good faith and reasonableness" is a defense, defendant bears the burden of proving those elements which would protect him from liability. *E. g., McCray v. Burrell,* 516 F.2d 357 (4th Cir. 1975); *Pritchard v. Perry,* 508 F.2d 423 (4th Cir. 1975).

*A. Defendant has not established good faith as a matter of law.*

Turning first to the question of Connor's good faith, the Court finds that defendant has not sustained his burden of establishing that element to an extent sufficient to warrant the issuance of summary judgment in his favor. The Court notes that, for reasons which will become clearer below, defendant has not argued the issue of good faith with any insistency in the motion before the Court. The only documents before the Court upon which a finding as to good faith could be based are Connor's three-page affidavit, see defendant's original motion for summary judgment of March 6, 1974, and Connor's deposition. While there may be sufficient facts in those documents for defendant to make out a case of good faith, the fact remains that defendant simply has not done so. The parties have not focused either on the meaning of "good faith" in general or on the application of that concept to the facts in the instant case. Absent such an effort by the parties to organize the facts in this case and offer conclusions as to the inferences which should be drawn, it is not even clear that all of the material facts which could bear upon a determination of good faith have been developed.

▮▮▮ The case against this Court reaching a decision on the issue of Connor's good faith at this point is made even stronger when it is recalled that this case is currently before the Court on a motion for summary judgment. A determination as to good faith involves a determination of a state of mind. "Inasmuch as a determination of someone's state of mind usually entails the drawing of factual inferences as to which reasonable men might differ—a function traditionally left to the jury—summary judgment often will be an inappropriate means of resolving an issue of this character." 10 Wright and Miller, *Federal Practice and Procedure* § 2730, at 583–84 (1973). Similar considerations mitigate against the Court's deciding this issue on the basis of an affidavit and a deposition: "Much depends on the credibility of the witnesses testifying as to their own states of mind. In these circumstances the jury should be given an opportunity to observe the demeanor, during direct and cross-examination, of the witnesses whose states of mind are at issue." *Croley v. Matson Navigation Co.,* 434 F.2d 73, 77 (5th Cir. 1970) (Wisdom, J.); see also 10 Wright and Miller, *supra,* § 2722, at 480. In short, good faith in general and as a defense in actions for deprivations of civil rights, is almost always a question for determination by the fact-finder rather than the court on a motion for summary judgment. *See Pierson, supra,* 386 U.S. at 557, 87 S.Ct. at 1219, 18 L.Ed.2d at 296; *Clark v.*

*Zimmerman,* 394 F.Supp. 1166, 1176 n.2 (M.D.Pa.1975); *Beightol v. Kunowski,* 382 F.Supp. 985, 987 (M.D.Pa.1974).

### B. Defendant has not established reasonableness as a matter of law.

Assuming *arguendo* that defendant Connor had in fact established his good faith as a matter of law, the Court would still deny summary judgment because of his failure to prove the second prong of the two-part defense, "reasonableness."

As noted above, defendant did not focus upon the issue of good faith in his summary judgment pleadings. This was due in part, no doubt, to defendant's belief that he is entitled to judgment as a matter of law by virtue of the fact that the arrest he made was performed pursuant to a regulation which, no matter what constitutional deficiencies it may have possessed, was nonetheless valid and in force in the District of Columbia at the time of the arrest. Defendant relies solely on *Pierson, supra,* for the proposition that an officer is immune from liability for any arrest made under a statute or regulation which, at the time of the arrest, is "on the books."

▆ This Court does not read *Pierson* to stand for the proposition for which it is cited by defendant. In *Pierson,* the arrest in question took place under a statute which, as in the instant case, was subsequently held to be unconstitutional. But, unlike the instant case, the statute was not overturned pursuant to a long line of prior authority. Rather, the statute was overturned pursuant to a constitutional development which, the Court held, the officer should not have been bound to anticipate. It was in this context that the Court held, "We agree that a police officer is not charged with predicting the future course of constitutional law." 386 U.S. at 557, 87 S.Ct. at 1219, 18 L.Ed.2d at 296. The clear implication of *Pierson* is that an officer can be held liable when acting under a statute which has not been declared unconstitutional, if it is found that he or she should have anticipated that the statute could not pass constitutional muster.[15]

▆ Given this Court's conclusion above that *Pierson* does not dictate a finding that defendant Connor acted reasonably as a matter of law, the inappropriateness of deciding this question on a motion for summary judgment becomes clear. First, inasmuch as defendant's counsel relied on the theory discussed above, he consequently declined to engage in any extended discussion in the pleadings as to whether Connor's actions met the "reasonable person" standard. For instance, while there is a description in Connor's deposition of his duties, there has been little effort to relate the scope of his duties to the reasonableness of his actions; yet, such a consideration would certainly seem critical to a determination as to whether he acted reasonably. Moreover, just as good faith is a question usually reserved for the fact-finder, so "even when there is no dispute as to the facts, it usually is for the jury to decide whether the conduct in question meets the reasonable man standard . . . ." 10 Wright and Miller, *supra,* § 2729, at 572–73; see also *Pierson, supra,* 386 U.S. at 557, 87

---

15. See Theis, *supra* note 14, at 1004. The Supreme Court's recent decision in *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), although made in the specific context of school discipline, would seem to buttress this Court's conclusion:

"[A]n act violating a student's constitutional rights can be no more justified by ignorance or disregard of settled, indisputable law on the part of one entrusted with supervision . . . than by the presence of actual malice. . . . [A] school board member . . . must be held to a standard of conduct based . . . on knowledge of the basic, unquestioned constitutional rights of his charges. . . . [W]e hold that a school board member is not immune from liability for damages under § 1983 if he knew or reasonably should have known that the action he took . . . would violate the constitutional rights of the student affected . . . ." 420 U.S. at 321–22, 95 S.Ct. at 1001, 43 L.Ed.2d at 225.

A number of courts have held police officers liable for acting in clear contravention of settled constitutional law, even though the defendants acted pursuant to regulations or statutes then in force. *E. g., Slate v. McFetridge,* 484 F.2d 1169 (7th Cir. 1973); *Seals v. Nicholl,* 378 F.Supp. 172 (N.D.Ill.1973).

S.Ct. at 1219, 18 L.Ed.2d at 296; *Clark v. Zimmerman, supra,* 394 F.Supp. at 1176, n. 2; *Beightol v. Kunowski, supra,* 382 F.Supp. at 987. In order to justify summary judgment, defendant would have to convince this Court that, as a matter of law, he acted reasonably. There is simply no sufficient basis at this stage for a finding of that nature by the Court.[16]

## IV. *Liability of Defendant Wilson*

The issue of the liability of defendant Jerry V. Wilson, Chief of the MPD when the events giving rise to this action occurred, is currently before the Court on cross motions for summary judgment.

The pertinent facts as alleged by plaintiff are as follows: Wilson knew of the dubious constitutionality of the speech regulation, since he was aware that an attorney in the office of the General Counsel of the MPD had requested an opinion on the regulation from the Corporation Counsel. He also knew or should have known of the applicable constitutional principles because of his involvement as a defendant in the cases of *A Quaker Action Group v. Wilson,* C.A. 70–2915 (D.D.C. Dec. 8, 1971), and *OD v. Wilson,* 323 F.Supp. 76 (three-judge court, D.D.C.1971).[17] Wilson was also aware that, without efforts on his part to hasten the issuance of an opinion, it was likely to take a year or more for the Corporation Counsel to respond to the request for an opinion. In addition, Wilson recognized that arrests pursuant to the speech regulation were a continuing possibility. Plaintiffs allege that Wilson could have taken one of two steps to reduce the risk of arrests over the period of time involved: 1) he could have suspended enforcement of the regulation pending issuance of an opinion by the Corporation Counsel; or 2) he could have hastened the issuance of an opinion from the

Corporation Counsel by requesting a prompt response to the request made by the office of the General Counsel of the MPD. According to plaintiffs, Wilson's failure to take any preventive measures led directly to the arrest of Shifrin and, therefore, renders Wilson liable for the deprivation of Shifrin's constitutional rights.

### A. *Defendant Wilson is not entitled to summary judgment.*

Defendant Wilson's motion for summary judgment is based on two grounds, each of which is quickly dismissed by the Court.

First, defendant relies on *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), contending that *Pierson* renders him immune from liability. As indicated in the Court's discussion of *Pierson* in part III, *supra, Pierson* is applicable to arresting officers; while the principles expressed in *Pierson* may have some applicability in evaluating Wilson's conduct, the case is certainly not dispositive of the issue of Wilson's liability. Moreover, and again as indicated in the Court's prior discussion, *Pierson* does not settle the issue of liability on the facts of this case, but merely provides standards of conduct by which liability is to be determined.

Second, defendant suggests that Wilson is immune from suit arising out of acts committed within his discretion. It is true that under District of Columbia common law principles, a distinction is made between discretionary and ministerial acts of public officials, and immunity is provided in cases involving the former. But common law immunity is not automatically available in cases arising under 42 U.S.C. § 1983, see *Carter v. Carlson,* 144 U.S.App.D.C. 388, 447 F.2d 358 (1971), *rev'd on other grounds sub nom. District of Columbia v. Carter,* 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973),[18] or in cases arising under the Con-

---

16. Of course, the Court makes no intimations at this time as to the ultimate merits of plaintiff's claim against defendant Connor or, more specifically, as to whether or not it believes, on the record as it now stands, defendant Connor acted reasonably.

17. See part II, *supra,* for discussion of those two cases.

18. The Supreme Court reversed the decision of the court of appeals in *Carter* on the grounds that the District of Columbia is not a "state or territory" within the meaning of 42 U.S.C. § 1983. The appellate court's conclusion that common law immunities are not necessarily applicable to cases arising under § 1983 would

stitution itself and 28 U.S.C. § 1331(a), see *Apton v. Wilson,* 165 U.S.App.D.C. 22, 506 F.2d 83 (1974).

B. *Defendant Wilson is entitled to a "good faith-reasonableness" qualified immunity.*

█ This is not to say that public officials are left unprotected by any immunities or defenses in suits arising out of actions taken in their official capacities. In the recent case of *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), the Supreme Court carved out a qualified immunity for executive officials in cases brought under 42 U.S.C. § 1983; the immunity much resembles the defense afforded arresting officers in *Pierson, supra:*

> "[I]n varying scope, a qualified immunity is available to officers of the executive branch of government, the variation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based. It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good-faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct." *Scheuer, supra,* 416 U.S. at 247–248, 94 S.Ct. at 1692, 40 L.Ed.2d at 103.

As noted above, *Scheuer* was brought under 42 U.S.C. § 1983. The defendants to whom the immunity was applied were executive officials of state government. In *Apton v. Wilson, supra,* the court of appeals for this circuit adopted the *Scheuer* qualified immunity in a case brought under the Constitution and 28 U.S.C. § 1331(a) and involving executive officials of the federal government. The court reasoned that, since the rights at stake in an action brought under the Constitution are similar to and of the same magnitude as those involved in actions brought under § 1983, the same qualified immunity which is available in the latter type of action should be available in the former.[19] 506 F.2d at 93. The court also found it appropriate to extend the *Scheuer* qualified immunity for high executive officials of a state government to the federal officials involved in *Apton,* because:

> "[L]ike the highest executive officer of a state, the head of a Federal executive department has broad discretionary authority. Each is called upon to act under circumstances where judgments are tentative and an unambiguously optimal course of action can be ascertained only in retrospect. Both officials have functions and responsibilities concerned with maintaining the public order . . . ." *Id.*

This Court views *Apton* as providing direct precedent for applying the *Scheuer* qualified immunity to defendant Wilson. This action is, like *Apton,* brought under the Constitution and 28 U.S.C. § 1331(a).[20]

seem to stand unaffected by the Supreme Court's decision, however, along with the rest of the appellate court's opinion not relating to the narrow issue of the District's status under § 1983. See *Marusa v. District of Columbia,* 157 U.S.App.D.C. 348, 484 F.2d 828, 831 (1973). On the nonapplicability of common law immunities to actions for deprivations of civil rights, see also note 14, *supra,* and accompanying material in the text.

**19.** This aspect of the *Apton* decision has been criticized as authorizing an unwarranted intrusion by the federal courts into the affairs of a coordinate branch of the federal government. Comment, 21 Wayne L.Rev. 1141 (1975). The author points out the the *Scheuer* qualified immunity was developed in the context of a case arising under 42 U.S.C. § 1983, a statute

which was intended to enable the federal courts to supervise activities of state officials, and questions the automatic application of the same standard of liability to federal officials.

Such criticism notwithstanding, other federal circuit courts of appeals have taken the same approach as *Apton* in applying the *Scheuer* immunity to federal officials. See *Mark v. Groff,* 521 F.2d 1376 (9th Cir. 1975) and cases cited therein at 1380.

**20.** Assuming *arguendo* the validity of the criticism of *Apton* discussed in note 19, *supra,* it would appear to be inapplicable to the instant case. Congress passed § 1 of the Civil Rights Act of 1871, 42 U.S.C. § 1983, in the period of increasingly turbulent race relations which followed the Civil War. The Act was designed to provide for federal judicial control over the

Further, defendant Wilson, like the defendants in *Scheuer* and *Apton,* had "broad discretionary authority" in the exercise of his duties as Chief of Police. He was "called upon to act under circumstances where judgments are tentative." Clearly, as Chief of Police, he had "functions and responsibilities concerned with maintaining the public order." *Id.* In short, he occupied a position in the District of Columbia government roughly comparable in scope of discretion to those occupied by the executive officials to whom the qualified immunity was applied in *Apton* and *Scheuer.* To deny defendant Wilson the same qualified immunity would not only be inconsistent with prior authority but would be inimical to the ability of present and future chiefs of the MPD to carry out their duties in an effective manner.

*C. Determination of Wilson's liability on summary judgment is not appropriate.*

Having established that Wilson is entitled to the "good faith and reasonableness" qualified immunity, the Court turns to the question of whether, under those standards, his liability can be determined on plaintiff's motion for summary judgment. The focus of the instant inquiry is "reasonableness"; plaintiffs . contend that Wilson's conduct was so patently unreasonable that, even assuming, *arguendo,* he acted in good faith, the quality of his actions render nugatory

any good faith defense he might invoke and lead inevitably to the conclusion that he acted unreasonably as a matter of law. For the reasons which follow, the Court cannot agree.

First, the Court must re-emphasize that a determination of reasonableness, in the context of this case and in general, is usually a question for the fact-finder. See part IIIB, *supra.* If this Court could find that no reasonable juror would be capable of judging defendant's conduct reasonable, then it would be appropriate for the Court to grant summary judgment for the plaintiff. But this is not such a case. Factors such as Wilson's failure to take preventive measures to ensure that the constitutionally-suspect regulation would not be enforced while the request for an opinion from the Corporation Counsel was pending are counter-balanced by such facts as Wilson's decision, through his General Counsel, to seek in the first place an opinion on a regulation which had not been challenged in any concrete factual situation. In addition, case law does not present sufficiently analogous factual situations to serve as a guide to this Court in determining whether Wilson acted unreasonably as a matter of law; although the cases cited by plaintiff [21] might be helpful in the formulation of standards by which defendant's conduct could be measured, they are not sufficiently on point to

unconstitutional acts of state officials; it was necessary because, at the time it was passed, there was no general federal question jurisdiction in the federal courts. The Act was inapplicable to the District of Columbia, but not because the District was a federal entity and its officers federal officials; rather, the federal government already had supervisory powers over District officials at the time the Act was passed, through the federal courts' jurisdiction over local matters and Congress' plenary power to legislate for the District. See *District of Columbia v. Carter,* 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973). With the passage of the Court Reform Act of 1970, Pub.L.No.91-358, 84 Stat. 473, divesting the federal district courts in the District of Columbia of their jurisdiction over local matters, it would seem that these federal courts, in supervising the unconstitutional activities of District officials in actions brought under 28 U.S.C. § 1331(a), perform a function more closely resembling the role of

federal courts in supervising the activities of state officials in § 1983 actions. For these reasons, the instant action is even more analogous to a § 1983 action than *Apton;* therefore, even stronger reasons exist for applying the *Scheuer* standards to the instant case.

21. *E. g., Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Slate v. McFetridge,* 484 F.2d 1169 (7th Cir. 1973); *Seals v. Nicholl,* 378 F.Supp. 172 (N.D.Ill.1973); . *Preston v. Cowan,* 369 F.Supp. 14 (W.D.Ky. 1973), aff'd in part, vacated in part, remanded in part (relevant portion aff'd) 506 F.2d 288 (6th Cir. 1974); *Sostre v. Rockefeller,* 312 F.Supp. 863 (S.D.N.Y.1970), aff'd in part, modified in part, reversed in part sub nom. en banc (relevant portion aff'd) *Sostre v. McGinnis,* 442 F.2d 178 (2d Cir. 1971); cert. denied sub nom. *Sostre v. Oswald,* 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972).

lead the Court to the conclusion that defendant's conduct was unreasonable as a matter of law. Moreover, it is not even clear that all issues of fact bearing on a determination of reasonableness are beyond dispute. For instance, the frequency with which the regulation had been enforced prior to the time of the request for an opinion on its constitutionality would seem to have a bearing on whether Wilson's failure to suspend the regulation was unreasonable. While this factor has been briefly alluded to in the papers before the Court and at oral argument on these motions, no systematic presentation of the past history of the enforcement of and compliance with the regulation has been made by either side in this case.

Given this Court's finding that it cannot conclude that Wilson acted unreasonably as a matter of law, the issue of good faith becomes relevant; for, if Wilson is to gain the benefit of the qualified immunity, he must prove not only that he acted reasonably, but also that he acted in good faith. The issue of good faith, as demonstrated in part IIIA, *supra,* is also one for the jury.

■ In summary, the Court concludes in this section that defendant Wilson is entitled to invoke a "good faith and reasonableness" qualified immunity, as set forth in *Scheuer, supra,* and *Apton, supra.* The Court also finds that, on the facts of this case as presented by the parties, it would be improper to conclude that Wilson acted unreasonably as a matter of law. Accordingly, each side's motion for summary judgment will be denied.

## V. *Liability of Defendant Murphy*

The issue of the liability of C. Francis Murphy, Corporation Counsel for the District of Columbia, is also before the Court, on cross motions for summary judgment.

The facts alleged by plaintiffs and pertinent to their motion for summary judgment are as follows: The request for an opinion on the speech regulation's unconstitutionality was received in Murphy's office on May 2, 1972. On May 12, it was incorrectly routed to the Civil Proceedings Division of the office. Five days later, it was correctly re-routed to the Special Assignments Division and assigned to Assistant Corporation Counsel Gilbert Gimble. In the next four months, no work was performed on the request for an opinion; then, on September 13, 1972, it was reassigned to Assistant Corporation Counsel David Eisenberg. Having received no instructions as to when the assignment should have been completed, Mr. Eisenberg failed to work on the opinion for five and a half months. He finally prepared a draft opinion in early March, 1973, nearly a month after Shifrin's arrest. The draft was submitted to the Corporation Counsel on March 14, 1973, and signed, after minor revisions were made, five days later.

Plaintiffs allege that an utter failure on the part of the Corporation Counsel to supervise the processing of opinion requests in his office caused the ten-month delay from the time the opinion was requested until it was issued, and led to Shifrin's arrest under an unconstitutional regulation. Specifically, plaintiff notes that the Corporation Counsel's office operated under a system whereby the only opinion requests which received priority treatment were those which included a request that the opinion be issued by a certain date. If an opinion request failed to specify a certain date by which the opinion was needed, the request received no priority rating relative to other such requests. Thus, regardless of the subject matter of a request, if it failed to specify a date by which a response was necessary, it was simply assigned to an attorney in the office and committed to that attorney's unsupervised discretion as to when the request should be handled in relation to other matters assigned to him or her.

Plaintiffs also allege that the circumstances of the instant case mandated a speedy reply from the Corporation Counsel. Plaintiffs point out that the MPD asked for an "early response" in its request for an opinion on the constitutionality of the speech regulation. In addition, that request on its face directed the Corporation

Counsel's attention to the decision of Judge Gesell in *A Quaker Action Group v. Wilson,* C.A. No. 70–2915 (D.D.C. Dec. 8, 1971), and indicated that the decision appeared to call into question the constitutionality of the speech regulation. Moreover, plaintiffs allege, the Corporation Counsel was already familiar with the governing constitutional principles because he had previously rendered advice to other officials as to similar District of Columbia permit provisions. In short, plaintiffs maintain, the Corporation Counsel was on notice of the likelihood that the regulation was unconstitutional; he was therefore aware that the risk of arrests under an unconstitutional provision would exist until he responded to the MPD's request for an opinion. In light of all of these facts, plaintiffs allege, Murphy's failure to properly supervise the handling of opinion requests in his office, a failure which led directly to the foreseeable result of the arrest of plaintiff Shifrin under an unconstitutional regulation, constituted negligence as a matter of law, for which Murphy is civilly liable.

*A. Defenses raised by Murphy.*

In response to plaintiffs' motion for summary judgment, defendant Murphy raises several defenses which, if valid, would dispose of the claim against him. The Court turns first to these defenses.

*1. Plaintiffs' claim is not barred by the statute of limitations.*

Defendant Murphy alleges that the applicable statute of limitations bars the instant action. Defendant was not named in the original complaint filed in this case, but was instead added in plaintiffs' amended complaint, which was filed with leave of Court on August 26, 1974. Defendant contends that the claim against Murphy is one for false arrest and imprisonment, for which the applicable statute of limitations in the District of Columbia is one year. 12 D.C.Code § 301(4). Since the alleged false arrest occurred in February, 1973, plaintiffs' claim against Murphy is barred, defendant argues, by the one-year statute of limitations.

The Court notes first that this action was not brought under the common law; rather, it was brought under the Constitution of the United States. However, "[a]s to actions at law, the silence of Congress has been interpreted to mean that it is federal policy to adopt the local law of limitation." *Holmberg v. Armbrecht,* 327 U.S. 392, 395, 66 S.Ct. 582, 584, 90 L.Ed. 743, 746 (1946). Thus, the applicable statute of limitation for an action brought under 42 U.S.C. § 1983 is the same as that which "the state courts would enforce in a comparable state action . . . ." *Ortiz v. LaVallee,* 442 F.2d 912, 913–14 (2d Cir. 1971). This Court believes the same analysis applies to actions brought under the Constitution and 28 U.S.C. § 1331(a). Accordingly, defendant is correct in asserting the applicability of the District of Columbia statute of limitations.

Where the Court disagrees with the defendant, however, is in the latter's characterization of this action as one for false arrest and imprisonment. Certainly, that characterization would be correct as to Shifrin's claim against the arresting officer, defendant Connor. But a close reading of plaintiffs' complaint makes it clear that the cause of action stated against defendant Murphy sounds in negligence: the basic allegations involve Murphy's failure to properly supervise his staff so as to prevent delay in the issuance of an opinion on the speech regulation.[22] The applicable limita-

---

**22.** In the recent Supreme Court case of *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561, 44 U.S.L.W. 4095 (1976), Mr. Justice Blackmun, in dissent, expressed dismay at what he believed to be the implication of the majority's ruling in that case: "that a state official is not subject to the strictures of 42 U.S.C. § 1983 unless he directs the deprivation of constitutional rights." *Id.,* 423 U.S. at 384, 96 S.Ct. at 610, 46 L.Ed.2d at 577, 44 U.S.L.W. at 4102. Although defendants in this case have

not raised the *Rizzo* case, which came down after the instant case was argued before this Court, the Court feels compelled to address the *Rizzo* case because of its possible relevance to the issue of whether actions for negligent deprivations of civil and constitutional rights can be brought under § 1983. Almost all of the federal circuit courts of appeals have reached the conclusion that such actions can be brought under § 1983. *Id.* 423 U.S. at 384, 96 S.Ct. at 610, 46 L.Ed.2d at 577, 44 U.S.L.W. at

tions period for negligence actions in the District of Columbia is three years. See 12 D.C.Code § 301(8). Accordingly, the claim against Murphy is not barred by the statute of limitations. See *Marusa v. District of Columbia,* 157 U.S.App.D.C. 348, 484 F.2d 828, 833 (1973), which involved a similar problem of characterization of a cause of action for purposes of the District's statute of limitations.

*2. Defendant owed a duty of care to plaintiff Shifrin.*

■ Defendant also maintains that he cannot be held civilly liable in the instant case because, as Corporation Counsel, he owes no duty to private plaintiffs with respect to the manner in which he carries out his functions. Again, the Court disagrees.

Invocations of the concept of "duty" often confuse rather than illuminate legal disputes:

> "The statement that there is or is not a duty begs the essential question—whether the plaintiffs' interests are entitled to legal protection against the defendant's conduct. . . . ['Duty'] is a shorthand statement of a conclusion, rather than an aid to analysis itself. It is embedded far too firmly in our law to be discarded. . . . . But it should be recognized that 'duty' is not sacrosanct in itself but only an expression of the sum total of those considerations of policy which lead the law to say that the partic-

ular plaintiff is entitled to protection." W. Prosser, *Law of Torts* § 53, at 325–26 (4th ed. 1971).

Thus, the question which must be asked in the instant case is whether the law affords protection to the plaintiff against the allegedly negligent acts of the defendant. In responding to this question, the Court is aided by an analysis of the "duty" problem as it arises under 42 U.S.C. § 1983, a statute which creates an action analogous to the instant suit brought under the Constitution. In enacting § 1983, Congress made a decision to extend protection to all persons whose constitutional rights are violated by officials acting under color of state law. The Supreme Court has instructed that this protection, and concomitant duty imposed on state officials, should "be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." *Monroe v. Pape,* 365 U.S. 167, 187, 81 S.Ct. 473, 484, 5 L.Ed.2d 492, 505 (1961). It is this Court's belief that similar analysis is called for in analogous actions brought under the Constitution. Accordingly, the concerns expressed by defendant in his invocation of the problem of "duty" are better expressed as a problem of proximate cause; that is, whether the alleged deprivation of constitutional rights was a "natural consequence" of the allegedly negligent actions of the defendant. Proximate cause, of course, is a question for the finder of fact. See Prosser, *supra,* § 45, at 290.[23]

---

4102, n. 2 and accompanying material in the text. This Court is of the opinion that if the Supreme Court had intended to overturn this overwhelming sentiment in the federal circuit courts, it would have done so explicitly; yet, none of the circuit cases cited by Justice Blackmun were even mentioned in the majority opinion. More broadly, *Rizzo* strikes this Court as a case decided solely on its facts. Its distinguishing aspect is a finding that the supervisory police officials involved had no responsibility for the acts complained of on the facts of the case; under those circumstances, the Supreme Court found it inappropriate to extend relief under § 1983 as against those officials. In the instant case, plaintiffs allege that defendant Murphy had a responsibility to act which was breached through negligence. The cases are therefore distinguishable.

Even if *Rizzo* stands for the proposition that negligence actions cannot be brought under § 1983, the relevance of that holding to an action brought in the District under 28 U.S.C. § 1331(a) and the Constitution is far from clear. See *Jamison v. McCurrie,* 388 F.Supp. 990, 992–93 n. 2 (N.D.Ill.1975).

**23.** The case of *Donovan v. Reinbold,* 433 F.2d 738 (9th Cir. 1970), supports the Court's conclusion that, in rendering advice to various departments of the District government, the Corporation Counsel owes a duty of care to the public in general and to potentially-affected individuals. In *Donovan,* the Ninth Circuit Court of Appeals found a city attorney potentially liable in a case in which a discharged municipal employee had sued the attorney for improperly advising city police officials that they could ignore a decision of the city's personnel board

*3. Prosecutorial immunity is unavailable to the defendant in this case.*

Defendant also claims that he is entitled to a prosecutorial immunity which bars the instant action. While the Court finds in the next subsection, *infra*, that defendant Murphy is entitled to a qualified immunity, it concludes that the traditional absolute prosecutorial immunity is unavailable in this case.

Prosecutorial immunity stems from the immunity to which judges are entitled and is, in fact, often referred to as "quasi-judicial immunity." Thus, "[p]rosecutors have been held to enjoy absolute immunity in connection with those functions in which they participate in the judicial process." *Apton v. Wilson*, 165 U.S.App.D.C. 22, 506 F.2d 83, 91 (1974), *citing Yaselli v. Goff*, 12 F.2d 396 (2d Cir. 1926), *aff'd per curiam*, 275 U.S. 503, 48 S.Ct. 155, 72 L.Ed. 395 (1927). Very recently, the Supreme Court applied the common law absolute immunity in a case brought under 42 U.S.C. § 1983 against a prosecutor acting "within the scope of his duties in initiating and pursuing a criminal prosecution." *Imbler v. Pachtman*, 424 U.S. 409, 410, 96 S.Ct. 984, 985, 47 L.Ed.2d 128, 132, 44 U.S.L.W. 4250, 4251 (1976).

On the facts presented in *Imbler, supra*, the Court did not find it necessary to consider whether the acts of prosecutors committed in the discharge of their administrative and investigative duties, as opposed to acts committed while "initiating and pursuing a criminal prosecution," would likewise give rise to absolute immunity.[24]

However, although the Supreme Court has yet to consider the issue, various other courts, including the court of appeals for this circuit (whose rulings are binding on this Court), have held that the absolute immunity is not available for the acts of prosecutors committed beyond the scope of the judicial process. See *Imbler, supra*, 424 U.S. at 430, 96 S.Ct. at 995, 47 L.Ed.2d at 143, 44 U.S.L.W. at 4256 and cases cited therein at n.31; *Apton, supra*, 506 F.2d at 93–94. The rationale for not extending absolute immunity to the acts of prosecutors committed beyond the scope of their duties in initiating and pursuing criminal prosecutions was succinctly stated by Judge Leventhal in *Apton, supra*:

> "[T]he absolute immunity often accorded prosecuting attorneys cannot shield the defendants in this case [involving administrative and policy-making acts of prosecutors], for the prosecutor's absolute protection . . . is both justified and bounded by the judicial traditions and procedures that limit and contain the danger of abuse. Cases holding prosecutors absolutely immune have referred to them as 'quasi-judicial officers,' and the circumstances typically provide alternative instruments of the judicial branch to check misconduct—the discretion of the grand jury, the procedures of a trial, and the potential sanction of discipline imposed by the court itself." 506 F.2d at 93–94.

Thus, the relevant inquiry in the instant case is whether, in supervising his subordinates in the issuance of opinions to various branches of the District of Colum-

---

which had held the discharge of the plaintiff unjustified.

**24.** The Supreme Court has specifically reserved judgment on the issue:

> "The purpose of the Court of Appeals' focus upon the functional nature of the activities rather than respondent's status was to distinguish and leave standing those cases . . . which hold that a prosecutor engaged in certain investigatory activities enjoys not the absolute immunity associated with the judicial process . . . . We agree . . . that respondent's activities were intimately associated with the judicial phase of the

criminal process, and thus were functions to which the reasons for absolute immunity apply with full force. We have no occasion to consider whether like or similar reasons require immunity for those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than that of advocate. We hold only that in initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983." *Imbler v. Pachtman*, 424 U.S. 409, 430, 96 S.Ct. 984, 995, 47 L.Ed.2d 128, 143, 44 U.S.L.W. 4250, 4256–57 (1976) (footnotes omitted).

bia government, defendant Murphy was engaged in activity within the scope of the judicial process and therefore protected by prosecutorial immunity. The Court concludes that he was not engaged in such activity. In reaching this conclusion, the Court is guided by the decision of the Ninth Circuit Court of Appeals in the case of *Donovan v. Reinbold*, 433 F.2d 738 (1970). Plaintiff Donovan had been discharged from his job as a lifeguard for the City of Santa Monica, California. He sued, *inter alia*, the City Attorney and his assistant for rendering allegedly improper advice to city police officials to the effect that they could ignore a decision of the city's personnel board finding plaintiff's discharge unjustified. In determining whether the defendants were entitled to prosecutorial immunity, the court held:

> "The purpose of according judicial immunity is to protect the integrity of the judicial process. It is not to shield lawyers or judges from liability for the invasion of another's federally secured constitutional rights when the alleged invasion did not occur during the performance of acts that are an integral part of the judicial process. . . . Advice by a lawyer that his client ignore an order of an administrative agency directed to the client is not an act that can be considered as done during the litigation process. Such an act does not protect the integrity of quasi-judicial process." 433 F.2d at 743–44.

A similar analysis applies in the instant case. In supervising the issuance of opinions, the Corporation Counsel does not engage in acts which "are an integral part of the judicial process." *Id.* Moreover, there are no "alternative instruments of the judicial branch to check misconduct" in the instant case. See *Apton, supra,* 506 F.2d at 94. If it is true, as plaintiff Shifrin alleges, that defendant Murphy acted negligently and that Murphy's negligence caused a deprivation of plaintiff's constitutional rights, no vehicle exists for the recompense for that deprivation other than the instant action. Under these circumstances, absolute prosecutorial immunity cannot be extended.

**B. Defendant Murphy is entitled to a "good faith-reasonableness" immunity.**

 As in the case of defendant Wilson, the Court will not leave defendant Murphy entirely unprotected. It is the Court's conclusion that Murphy is entitled to the same "good faith-reasonableness" qualified immunity extended to state executive officials in *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), and to federal executive officials in *Apton v. Wilson*, 165 U.S.App.D.C. 22, 506 F.2d 83 (1974).

*Apton, supra,* provides strong precedent for extending the qualified immunity to Murphy. In *Apton,* the court of appeals extended the *Scheuer* immunity to all of the federal executive defendants there involved, including the Attorney General of the United States. The court found that the Attorney General, along with the other federal defendants, "has broad discretionary authority" and "functions and responsibilities concerned with maintaining the public order." It was therefore appropriate, according to the Court, to extend to the federal defendants, including the Attorney General, the same immunity which the Supreme Court had applied to state officials. The fact that the Attorney General was not entitled to absolute immunity in the circumstances of that case did not affect the *Apton* court's conclusion that he was entitled to a qualified immunity.

Defendant Murphy stands in a position entirely comparable to the Attorney General, the "nation's 'chief prosecutor.'" *Id.* at 93. Murphy, too, exercises broad discretionary authority and is concerned with maintaining the public order. Every reason exists for affording the Corporation Counsel the same qualified immunity which was granted to state executive officials in *Scheuer* and extended to the Attorney General in *Apton.*

**C. The issue of defendant Murphy's liability is not appropriate for determination upon motion for summary judgment.**

 Plaintiffs do not appear to question defendant Murphy's good faith. Rather, the relevant inquiry is whether, in supervis-

ing the affairs of the office of the Corporation Counsel, he acted reasonably. As discussed in detail in section IIIB, *supra*, reasonableness is ordinarily a jury question. The Court has reviewed all of the submissions with respect to the alleged negligence of defendant Murphy and has concluded that it would be inappropriate to find that he acted negligently as a matter of law; accordingly, the question will be reserved for the finder of fact.

In reaching this conclusion, the Court is influenced by the knowledge that the Corporation Counsel had a system, albeit an allegedly defective one, for the processing of requests for opinions. Thus, a determination of negligence in this case goes not to a total failure to supervise, but to an unreasonable choice of supervisory methods. To make such a determination on a motion for summary judgment would be difficult enough even if all relevant evidence had been produced. In the instant case, it is made even more difficult by the failure of the plaintiffs to develop such facts as the methods by which officials in comparable positions supervise their offices. In addition, while there is some information in the depositions filed in this case as to what the attorneys in the office were actually working on while the request for an opinion on the speech regulation was pending, there has been no effort by either side to interpret this information, despite the fact that a discussion of "priorities" would seem to have some relevance to the instant claim. In general, the Court believes that it is possible that more relevant information will be produced and that, in any case, plaintiffs have not produced sufficient evidence to justify a finding of negligence as a matter of law.

VI. *Liability of the District of Columbia*

Plaintiffs sue the District of Columbia under two theories of liability: 1) vicarious liability for the tortious acts of its employees; and 2) direct liability for its own failure to properly supervise its employees. Since the liability of the District is largely dependent upon the liability of the individual defendants, and since the Court declines to issue summary judgment in favor of or against any of those defendants, the issue of the District's liability is obviously one which need not be resolved at this stage of the proceedings. The Court will, however, discuss some of the legal issues which will affect a determination of the District's liability.

Although municipalities are immune from suit under 42 U.S.C. § 1983, that immunity stems from the unique legislative history of § 1983. See *Moor v. County of Alameda*, 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973); *Monroe v. Pape*, 365 U.S. 167, 187–191, 81 S.Ct. 473, 484–486, 5 L.Ed.2d 492, 505–507 (1961). Municipalities, including the District of Columbia, can be held liable in actions for deprivation of constitutional rights brought under 28 U.S.C. § 1331(a) and the Constitution. *E. g.*, *City of Kenosha v. Bruno*, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973); *Skehan v. Board of Trustees*, 501 F.2d 31 (3d Cir. 1974), *vacated on other grounds*, 421 U.S. 983, 95 S.Ct. 1986, 44 L.Ed.2d 474 (1975); *Tatum v. Morton*, 402 F.Supp. 719 (D.D.C.1974); *Williams v. Brown*, 398 F.Supp. 155 (N.D.Ill.1975); *Maybanks v. Ingraham*, 378 F.Supp. 913 (D.C.Pa.1974); *Dahl v. City of Palo Alto*, 372 F.Supp. 647 (N.D.Cal.1974). There is some question, however, as to whether municipalities are entitled to their local common law immunities in suits brought under § 1331(a). *Williams v. Brown, supra*, 398 F.Supp. at 160. The few courts which have considered the issue have found, at least implicitly, that municipalities are entitled to whatever common law immunities are applicable to the facts in cases brought under § 1331(a). *Skehan, supra*, 501 F.2d at 44; *Maybanks, supra*, 378 F.Supp. at 916. Since the parties in this case have not yet addressed these cases or this issue, the Court will give them an opportunity to file supplemental briefs before deciding whether to follow the decisions which have indicated that common law immunities would be available, to the extent applicable, in cases brought under § 1331(a). The parties should also discuss the issue of whether that immunity, as defined by the courts, would be applicable

to the District to bar *respondeat superior* and/or direct liability. See *Wade v. District of Columbia*, 310 A.2d 857 (D.C.App. 1973); *Carter v. Carlson*, 144 U.S.App.D.C. 388, 447 F.2d 358, 365–68 (1971), *rev'd on other grounds sub nom. District of Columbia v. Carter*, 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973).

## VII. *Conclusion*

The Court concludes that Article II, § 3 of the Police Regulations of the District of Columbia is unconstitutional on its face. The Court denies all motions for summary judgment, reserving the issues of the liability of the individual defendants for the finder of fact.[25] An Order in accordance with the foregoing will be issued of even date herewith.

## SUPPLEMENTAL MEMORANDUM OPINION

In this Court's Memorandum Opinion of March 9, 1976, the Court left open two questions, one relating to the standing of plaintiff Abraham Bloom and the other to the liability of the District of Columbia under 28 U.S.C. § 1331(a) and the Constitution. In this supplemental opinion, the Court resolves those remaining questions.

## I. *Standing of Plaintiff Bloom*

■ In the Memorandum Opinion, *supra*, at 1292 n.9, the Court noted that, despite defendants' demand of strict proof of Bloom's allegations of standing, such proof had not been proferred. The Court gave plaintiff Bloom a limited amount of time to submit the necessary materials to establish the genuineness of his allegations. Since the issuance of the opinion, plaintiff Bloom has submitted an affidavit supporting his allegations of past, present, and future exercise of his first amendment freedoms through participation in various organizations. Plaintiff has also sworn to the inhibiting effect of the speech regulation upon the exercise of his first amendment rights. Despite defendants' contentions that Bloom still lacks standing, the Court is now convinced that Bloom has demonstrated sufficient injury in fact to his constitutional rights to maintain this action.[1]

## II. *Liability of the District of Columbia*

The District of Columbia is sued in the instant case under two theories of liability: 1) vicarious liability for the tortious conduct of its employees; and, 2) direct liability for its own failure to properly supervise its employees. As pointed out in the Memorandum Opinion, *supra*, at 1305–1306, municipalities are subject to suit in actions for deprivation of constitutional rights brought under 28 U.S.C. § 1331(a) and the Constitution. *E. g., City of Kenosha v. Bruno*, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973); *Skehan v. Board of Trustees*, 501 F.2d 31 (3d Cir. 1974), *vacated on other grounds*, 421 U.S. 983, 95 S.Ct. 1986, 44 L.Ed.2d 474 (1975); *Tatum v. Morton*, 402 F.Supp. 719 (D.D.C.1974). There is some question, however, as to whether municipalities can invoke their local common law immunities in suits brought under § 1331(a). *Williams v. Brown*, 398 F.Supp. 155, 160 (N.D.Ill.1975). In the Memorandum Opinion, *supra,* the Court ordered the parties to submit further briefs on this question, and the parties have done so.

■ In deciding this question, it is necessary, first, to identify the extent of the

---

**25.** The possibility exists, of course, that the parties will submit this case for trial by the Court, either on the present record or with supplementary materials and oral testimony. In consideration of this possibility, the Court wishes to emphasize that nothing expressed in the foregoing opinion is meant to reflect the Court's view as to the ultimate liability of the individual defendants.

**1.** The question of Bloom's standing is largely academic. In the Memorandum Opinion, *su-* *pra,* the Court held that regardless of Bloom's standing, co-plaintiff Shifrin clearly had standing to maintain the challenge to the speech regulation. *Id.* at 1290–1292. The Court went on to hold the speech regulation unconstitutional. Bloom is involved only in that portion of the case challenging the regulation. Thus, his participation was unnecessary to bring the case to its present posture, and since he does not seek damages, he will not be involved in the remainder of the case.

District of Columbia's common law sovereign immunity. In *Wade v. District of Columbia,* 310 A.2d 857 (D.C.App.1973), the District of Columbia Court of Appeals held that "the District is immune from suit only if the act complained of was committed in the exercise of a discretionary function; if committed in the exercise of a ministerial function the District must respond." *Id.* at 860. The test for determining whether a given governmental function is discretionary and therefore one to which immunity ought to be applied is whether that function is " 'of such a nature as to pose threats· to the quality and efficiency of government in the District if liability in tort was made the consequence of negligent act or omission.' " *Id.*

Next it is important to realize that the policy goals served by federal actions, such as the instant case, for the deprivation of constitutional rights dictate that local common law immunities *not* be imported into such suits in a wholesale and uncritical manner. Memorandum Opinion, *supra* at 1294 n.14 and accompanying material in the text. Indeed, in the case of government *officials,* the Court has already held, pursuant to established precedent, that the common law immunity available for those officials' discretionary acts is not available in "constitutional tort" actions. *Id.* at 1297–1298. Instead, as this Court held, again pursuant to established precedent, a "good faith and reasonableness" qualified immunity is appropriate for the officials involved.

■ With that background, it becomes apparent that in cases involving alleged deprivation of constitutional rights it would make little sense to extend common law immunity to the District to protect it from vicarious liability for the discretionary but tortious acts of its employees. For, as noted above, the purpose of the immunity is to prevent threats to the proper functioning of government; yet, again as noted above, this Court has already held that government *officials* cannot invoke that immunity in constitutional tort cases. Thus, the "damage," if any, to the smooth functioning of government has been done: the officials themselves may be held liable for their discretionary but tortious acts in constitutional tort cases. Under these circumstances, protecting the District from vicarious liability for the same acts would not alleviate that damage.[2] *See Carter v. Carlson,* 144 U.S. App.D.C. 388, 447 F.2d 358, 367 (1971), *rev'd on other grounds sub. nom. District of Columbia v. Carter,* 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973).

Turning to the District's direct liability in constitutional tort cases, it might be argued that common law immunity *would* serve a purpose in protecting the District from liability when its own discretionary functions are involved, thereby ensuring the smooth and efficient operation of government. However, in the instant case, the defendants have not demonstrated that the functions in question—the supervision of police officers, the Police Chief, and the Corporation Counsel—are discretionary in nature. Indeed, the few indications from case law are to the contrary. *E. g., Thomas v. Johnson,* 295 F.Supp. 1025 (D.D.C.1968). More importantly, the federal policy involved here—protection of cherished constitutional rights—outweighs the goal of assuring quality and efficiency in government. As the Supreme Court has stated, " 'where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief.' " *Bell v. Hood,* 327 U.S. 678, 684, 66 S.Ct. 773, 777, 90 L.Ed. 939, 944 (1946), *as cited in Bivens v. Six Unknown Federal Narcotic Agents,* 403 U.S. 388, 392, 91 S.Ct. 1999, 2002, 29 L.Ed.2d 619, 624 (1971). Thus, in *Bivens,*

---

**2.** If damage is in fact done by establishing the possibility of liability for discretionary acts, it is, presumably, alleviated somewhat as to the officials by the qualified "good faith and reasonableness" immunity appropriate for constitutional tort cases. However, whether the benefit of this qualified immunity should extend to the District is an open question; indeed, one commentator has suggested that such an extension would serve little purpose. *See* Note, *Damage Remedies Against Municipalities for Constitutional Violations,* 89 *Harv.L.Rev.* 922, 955–58 (1976).

the Supreme Court provided the remedy which makes suits such as the instant one possible—a cause of action stemming from the Constitution itself. To allow the government to escape liability in such actions on the grounds that the functions which give rise to its liability are discretionary in nature would undercut the policy of *Bivens*; for it is often the case that the government is the only defendant in such cases with the resources to redress the constitutional deprivation involved. See 89 Harv.L.Rev., *supra,* at 955–58.

█ Accordingly, the Court holds that in federal actions for deprivation of constitutional rights under 28 U.S.C. § 1331(a), the District of Columbia can be held liable for its own acts and for those of its employees, regardless of whether those acts would fall within the common law immunity for discretionary functions.