COMMONWEALTH *vs.* JOHN J. YOUNG.

Suffolk.    October 3, 1950. — December 21, 1950.

Present: QUA, C.J., LUMMUS, SPALDING, & WILLIAMS, JJ.

*Manslaughter. Homicide. Police. Practice, Criminal,* Motion for finding; Requests, rulings and instructions.

The denial of a motion for a finding of not guilty in a criminal case heard by a judge without a jury was equivalent to a ruling that the evidence warranted a conviction.

Evidence of the circumstances in which a police officer, stationed at night in an alley where the light was uncertain to arrest a reputedly armed felon known to him only by photograph and description, confronted and then shot and killed a man, not the felon, who walked into the alley, together with evidence of statements made by the officer after the shooting, justified findings that the shooting was intentional, although in the mistaken belief on the part of the officer that the victim was the felon, and that the shooting was not legally justified, and warranted a conviction of the officer on a charge of manslaughter.

INDICTMENT, found and returned on March 16, 1950.

The case was heard in the Superior Court by *Smith,* J., without a jury.

*E. O. Proctor*, (*V. J. Cosgrove & R. K. Lamere* with him,) for the defendant.

*Edward M. Sullivan*, Assistant District Attorney, (*W. J. Foley, Jr.*, Assistant District Attorney, with him,) for the Commonwealth.

WILLIAMS, J. The defendant was found guilty by a judge of the Superior Court, sitting without jury, of manslaughter in causing the death of one Thomas Rivers. The trial was held under the provisions of G. L. (Ter. Ed.) c. 278, §§ 33A–33G, as amended, and after imposition of sentence the defendant appealed to this court, assigning as error the denial of his motion for a finding of not guilty. We consider this denial as equivalent to a ruling that the evidence warranted a finding against the defendant. See *Commonwealth v. Carter*, 306 Mass. 141, 143.

The following facts are not in dispute. On February 1, 1950, one John F. Daley, armed with a gun and knife and accompanied by two associates, effected the escape of one Atwood White from the Metropolitan State Hospital in Waltham. White was being held in the hospital for observation as to his sanity after arraignment on an indictment for armed robbery. On the evening of February 2 the defendant, a detective inspector in the State police, with State police officers Mead and Fried and Boston police officers Finnerty and Coughlin, met at police station 15 in Charlestown. The purpose of the meeting was to plan the arrest of Daley, who was expected to return to his home at 4 Bolton Place in Charlestown on that night about ten o'clock. Both Daley and White had police records and the State officers had in their possession police pictures of both men with their physical descriptions. The State officers had never seen Daley or White personally. Shortly before ten o'clock all five officers with one Johnson, a clerk in the office of the Middlesex district attorney, who had seen Daley with White when the latter had been arraigned in the court at East Cambridge, went to the vicinity of Bolton Place. Coughlin and Finnerty stationed themselves inside the house where Daley lived. Mead, Fried, and Johnson re-

mained in an automobile which was parked on Franklin Street near the corner of Bolton Place and High Street. Young went into Cary Place, a dead end alley, which ran northerly from High Street parallel to Bolton Place and led to the rear of the Daley house. Cary Place was approximately fifty feet in length and twelve to fifteen feet in width with a narrow sidewalk along its westerly side raised about six inches from the surface of the alley. The alley received light, the amount being in dispute, from a Welsbach gas burner located at the farther end of the alley from High Street. An automobile was parked about fifteen feet in from High Street. One Murray occupied the house on the southwest corner of High Street and the alley, and Young took a position behind a six foot board fence enclosing the back yard of the Murray house at a gate or door which opened from the yard into the alley. He was in civilian clothes and was armed with a double action thirty-eight calibre revolver which, to be fired, required a pull of seven and one half foot pounds on the trigger. About 10:15 P.M. an automobile came along High Street by the end of the alley. It stopped and its lights were turned off. Shortly thereafter a man, later identified as Thomas Rivers who lived at 2 Cary Place, entered the alley from High Street. As he approached the parked automobile and the gate, behind which Young was standing, the latter stepped out from the gate and confronted him. What occurred thereafter is in controversy. Young testified that he had his revolver in his right hand, held low at his side and pointing down; that he said, "I am a police officer, who are you"; that the man without replying lunged for him and grabbed him with both hands; that he, Young, went down off the curbing of the sidewalk; and that he shoved the man away and twisted to his right and "just then my gun went off." The bullet from the gun entered the chest of Rivers slightly to the right of his sternum, penetrated his heart, and came out at his back. The course of the bullet from front to back was substantially horizontal. It was a so called contact shot, the gun being held in contact with the clothing. Rivers,

within a short time, slumped to the ground and died. A later examination of his clothing indicated that at the time the shot was fired the outer garment of Rivers had been pulled or pushed nine inches from left to right. Murray, a witness for the Commonwealth, testified that he was in his house and heard a voice and a shot in the alley at almost the same time. He at once went out into the alley and saw two men, Rivers and Young, standing near by. Young appeared to have his arms around Rivers holding him up. Murray said to Young, "'that boy lives in the house there,' pointing toward the Rivers boy's home," and Young replied, "Jesus, I got the wrong guy and let him have it." Mrs. Murray testified that she heard a shot while walking on High Street, and on entering the alley saw Young and said to him, "That is the Rivers boy; why did you shoot him?" and that Young "took his head down and said, 'I gave it to him, I gave it to him.'" Officer Finnerty testified that later Young said to him, "I shot the wrong man."

Rivers unquestionably was killed by a bullet from a revolver held in the hand of the defendant. It was a question whether the shot was fired intentionally or, as contended by the defendant, accidentally. If fired intentionally, the further question presented was whether Young, a police officer stationed in the alley for the purpose of apprehending a person who had committed a felony, was justified in shooting.

These were questions of fact for the judge. *Commonwealth* v. *Randall*, 260 Mass. 303. *Commonwealth* v. *Peterson*, 257 Mass. 473. It is stated in *Commonwealth* v. *Webster*, 5 Cush. 295, 305, that "when one person assails another violently with a dangerous weapon, likely to kill and which does in fact destroy the life of the party assailed, the natural presumption is, that he intended death or other great bodily harm." Where the killing is caused by the intentional use of a deadly weapon malice may be inferred unless by the circumstances it is disproved. *Commonwealth* v. *York*, 9 Met. 93, 104. *Commonwealth* v. *Hackett*, 2 Allen, 136, 141. *Commonwealth* v. *Hawkins*, 3 Gray, 463, 465. *Common-*

*wealth* v. *Parsons,* 195 Mass. 560, 570. *Commonwealth* v.
*Bedrosian,* 247 Mass. 573, 576. 2 Bishop, Criminal Law
(9th ed.) § 657. 3 Bishop, New Criminal Procedure (2d ed.)
§ 602. Wharton's Criminal Law (12th ed.) § 419. Apart
from the probative effect of such an inference, there was evi-
dence sufficient to warrant a finding that the revolver was
fired intentionally rather than accidentally. Rivers was
five feet eleven and one half inches in height and Young
was an inch shorter. The location of the wound in Rivers's
chest and the course of the bullet through his body indicate
the position and level at which the revolver must have been
held when fired. A pressure of seven and one half foot
pounds was required to pull the trigger. Young's language
to Murray, Mrs. Murray, and Finnerty in referring to the
shooting, while somewhat ambiguous, could be taken to
mean that the shot was fired intentionally although in the
mistaken belief that the man who was shot was one of the
men whom he intended to arrest. "If death, though wil-
fully intended, was inflicted immediately after provocation
given by the deceased, supposing that such provocation
consisted of a blow or an assault, or other provocation on his
part, which the law deems adequate to excite sudden and
angry passion and create heat of blood, this fact rebuts the
presumption of malice; but still, the homicide being unlaw-
ful, because a man is bound to curb his passions, is criminal,
and is manslaughter." *Commonwealth* v. *Webster,* 5 Cush.
295, 305. Here it could have been found that the shot was
fired in the course of a struggle starting with a battery com-
mitted by Rivers on the defendant. The judge therefore
could have found that there was sufficient provocation to
negative the inference of malice and thereby to reduce the
offence to manslaughter.

It is the contention of the defendant that as matter of
law the judge was bound to find that the defendant was
justified in using the revolver. As above stated the issue
of justification was one of fact. The defendant was a police
officer having a duty to effect the arrest of one known to have
committed a recent felony, and reputed to be armed with a

gun and knife. He had the right to use the force which was reasonably necessary to overcome resistance by the person sought to be arrested. *Powers* v. *Sturtevant*, 199 Mass. 265, 266. *Murdock* v. *Ripley*, 35 Maine, 472. 1 Bishop, New Criminal Procedure (2d ed.) § 159 (2). Voorhees, Arrest (2d ed.) § 193. If the circumstances made it reasonably necessary, he could even use such force as might result in the killing of the person to be arrested. 2 Hale, P. C. 91. Wharton, Homicide (3d ed.) § 489. Voorhees, Arrest (2d ed.) § 193. *People* v. *Adams*, 85 Cal. 231, 235–236. *United States* v. *Jailer of Fayette County*, 2 Abb. 265, 280–281. See 1 Bishop, New Criminal Procedure (2d ed.) § 160; Wharton's Criminal Law (12th ed.) § 530. It was for the judge to determine what act or acts on the part of the defendant were reasonably necessary to effect the arrest. *Commonwealth* v. *York*, 9 Met. 93, 104. If Young, in view of the uncertain light in the alley and the physical appearance of Rivers as compared with the police descriptions of Daley and White, was found to have reasonable cause to believe that Rivers was either Daley or White, it could be found that in firing his revolver Young exerted a force greater than was necessary to effect the arrest. Rivers apparently was not attempting to run away, there was no evidence that he was armed, and Young had him within his grasp. There was evidence that Young was a powerful man somewhat heavier than Rivers and was a trained wrestler.

In his brief the defendant urges that it is "common knowledge that criminals are quick to shoot when in danger of apprehension, [and] the courts ought not to render the police officer's career more hazardous by requiring a standard of caution in the use of his weapons which, if followed, would tend to jeopardize his life and, if not followed, tend to jeopardize his liberty." We are not unmindful of the difficult situation in which the defendant was placed when, if his testimony is to be believed, Rivers seized him with both hands. He was faced with an emergency which created the necessity for forceful and immediate action on his part. Doubtless because of his duty as a police officer he would be

justified in using more force than was necessary for his defence. It was held, however, in *Powers* v. *Sturtevant*, 199 Mass. 265, 266, that it could not be ruled "that . . . [the officer] was the sole judge of the propriety and necessity of the power to be used in making the arrest, and that if he exercised his best judgment and acted in good faith and without malice, he was not liable for the use of such force as he deemed necessary." It was for the judge to determine what force, in the circumstances, was reasonably necessary.

As there was evidence warranting a finding that the shooting was intentional and without legal justification, we are not called upon to consider whether there was evidence sufficient to sustain a finding of involuntary manslaughter.

*Judgment affirmed.*