Roland E. HILTON, Administrator of the
Estate of David L. Hilton

v.

STATE of Maine.

Supreme Judicial Court of Maine.

Dec. 2, 1975.

Smith, Elliott & Wood by ·Randall E. Smith, Roger S. Elliott, Saco, for plaintiff.

Verrill Dana Philbrick Putnam & Williamson by John A. Mitchell, Portland, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK and ARCHIBALD, JJ.

WERNICK, Justice.

By Resolve approved by the Governor on June 4, 1969 (Resolves, 1969, Chapter 27) the Legislature authorized " . . . the estate of David L. Hilton, acting by his personal representative", to sue the State of Maine to recover

" . . . damages, if any, resulting from the death of David L. Hilton, . . . who, his estate claims, was wrongfully or negligently shot and killed on April 20, 1967, . . . as a result of wrongful or negligent actions and manner by which his capture and apprehension as a wanted felon was attempted and executed by law enforcement officers of the State of Maine; . . .."

Procedurally,

" . . . the conduct of . . . [the] action . . . [was to] be according to the practices of actions and proceedings between parties and suitors in . . . Superior Court, . . .."

except that

"[h]earing . . . shall be before 3 Justices of the Superior Court without a jury; said justices to be assigned by the Chief Justice of the Supreme Judicial Court."

Substantively,

" . . . the liabilities of the parties, and elements of damage, if any, . . .

[were to] be the same as the liabilities and elements of damage between individuals; . . . ."

Roland E. Hilton, as Administrator of the Estate of David L. Hilton, instituted the action in the Superior Court (York County) on January 9, 1970. Defendant State of Maine filed an answer. Simultaneously, defendant moved for summary judgment relying upon an affidavit in which the State Trooper who had shot and killed David L. Hilton described the circumstances of the homicide.

The further course of the litigation is summarized in the "Decision and Order" of the three Superior Court Justices assigned by the Chief Justice to hear the case, without a jury.

"The plaintiff's complaint . . . [was] filed in seven counts. Counts 4, 5, and 6 have been voluntarily dismissed. Count 1 . . . seeks damages for wrongful death, count 2 seeks damages pursuant to statute for conscious pain and suffering according to the common law, and count 7 seeks punitive damages. The parties have submitted to the court material indicating that there is no factual dispute. On the issue of liability each side has filed a motion for summary judgment as to the first three counts of the plaintiff's complaint. The parties agree that as to their respective motions for summary judgment as to counts 1, 2, and 3 . . . the same legal issue is presented, namely whether the killing of David L. Hilton by the State Trooper was a justifiable homicide. Both parties agree that if it was a justifiable homicide . . . there is no liability on the part of the state. On the other hand, both parties agree that if the killing was not a justifiable homicide . . . the issue of liability should be resolved in favor of the plaintiff."

The panel of Justices concluded that defendant's motion for summary judgment should be denied and plaintiff's motion granted. With the liability issue thus decided in favor of plaintiff, the panel ordered

". . . the matter . . . set for trial solely upon the issue of the damages, if any, incurred by the plaintiff."

As to damages, the panel granted defendant's motion to dismiss Count 7 of the Complaint which sought punitive damages and confined the damages recoverable to compensatory damages. After a hearing, the panel ordered entry of judgment for plaintiff in the amount of $13,105.50.

This judgment was entered on June 27, 1974. Defendant's appeal from the judgment is now before us.

We sustain the appeal.

The facts on which the panel rested its decision were:

"[T]he State Trooper involved was assisting other law enforcement officers in attempting to execute an arrest warrant upon the deceased David L. Hilton for the offense of breaking, entering and larceny in the nighttime. The death resulted from a shooting by the State Trooper when the deceased sought to escape and evade arrest."

■ To these facts the panel refused to apply as the governing law of Maine a principle of the common law acknowledged by the panel as "unquestioned" that, in the language of the panel,

". . . a police officer . . . justifiably kill[s] a fleeing felon if . . . [by] no other way the felon could be arrested."

Instead, the panel took as controlling the principle stated in Section 3.07(2)(b) of the American Law Institute's Model Penal Code:

"The use of deadly force [by a police officer to effect an arrest] is not justifiable . . . unless:

(i) the arrest is for a felony; and

\*   \*   \*   \*   \*   \*

(iv)   the actor believes that:

(1)   the crime for which the arrest is made involved conduct including the use or threatened use of deadly force; or

(2) there is a substantial risk that the person to be arrested will cause death or serious bodily harm if his apprehension is delayed."

Since the panel found that in the instant situation both of the elements prescribed as alternatives in (iv) (1), (2) were absent, it ruled that the "homicide here involved was not justifiable" and, in accordance with the stipulated framework for decision, resolved the tort liability issue in favor of plaintiff.

We decide that the panel committed reversible error in refusing to apply to this case the principle of the common law invoked by defendant and ruling, instead, that the case is controlled by the principle enunciated in Section 3.07(2)(b) of the Model Penal Code.

The foundation of the panel's analysis was its observation:

"[t]here is no case or statutory authority in the State of Maine indicating whether a killing under the circumstances . . . [here involved] constitutes a justifiable homicide."

The panel then reasoned as follows. First, the panel deemed archaic the theoretical rationale of the English common law principle that since, at common law, virtually all felonies were punishable by death,

"the killing of a fleeing felon resulted in no greater consequences than those which would inevitably result from his trial and conviction."

Second, the panel believed that because current penology punishes as "misdemeanors" many crimes involving conduct dangerous to life and limb and punishes as "felonies" many crimes not thus dangerous, the "felony-misdemeanor" classification of crimes no longer is, if ever it was, an adequate criterion to differentiate crimes dangerous to life and limb from those not so.

Thus finding the theoretical rationale and practical consequences of the common law principle at issue to be "inadequate for modern law", the panel decided to follow the aforementioned principle proposed by the Model Penal Code because the panel regarded it as striking

". . . the appropriate balance between the legitimate needs of law enforcement and the sanctity of human life."

■   Although there is persuasiveness in the panel's approach, we reverse its decision since we believe that the panel acted, here, beyond appropriate bounds of judicial functioning.

The panel did not see fit to amplify the significance intended by the observation that no case or statutory authority in Maine has expressly spoken upon whether a killing in the circumstances here involved constitutes a justifiable homicide. Were it the panel's thought that at the time of its decision there was no operative law in Maine governing the case before it and, therefore, the panel was entirely free to pronounce the law of Maine according to the panel's own view of what the Maine law should be, such conception would be erroneous.

In *Davis v. Scavone*, 149 Me. 189, 100 A.2d 425 (1953) this Court painstakingly analyzed the process by which those who settled the Colony of the Massachusetts Bay brought with them, and adopted as their law, the "common law of England" (149 Me. p. 194, 100 A.2d 425) which in turn, became the common law of the Commonwealth of Massachusetts by operation of the Massachusetts Constitution and, subsequently, the common law of the State of Maine by force of the Act of Separation and Article 10, Section 3 of the Constitution of Maine.

*Davis v. Scavone, supra,* elucidated (149 Me. at p. 195, 100 A.2d 425) that a particular principle of the "common law of England" would be the governing law of the Commonwealth of Massachusetts and likewise of Maine, notwithstanding the absence of an express holding by the Massachusetts or Maine Court acknowledging such principle as law, so long as it was compatible with the "new state and condition" of the colonists. (149 Me. p. 194, 100 A.2d 425) *Davis v. Scavone* further made clear that this Court would take as convincing evidence of such compatibility any approving references to the common law of England made by either the Massachusetts or Maine Courts even if such references had been forthcoming after Maine had become a separate State.[1]

We are satisfied that the Massachusetts Court's mention without indication of disapproval, in *Commonwealth v. Young,* 326 Mass. 597, 96 N.E.2d 133 (1950) of the principle of the common law of England here invoked by defendant and the Court's accompanying citation of *Murdock v. Ripley,* 35 Me. 472 (1853) as suggesting Maine's much earlier recognition of the principle, suffice to establish the principle as compatible with "the habits and manners" of the colonists and to stamp it as applicable to "their new state and condition."

Following the reasoning of *Davis v. Scavone, supra,* then, and borrowing the language of that precedent,

"[i]t is upon the . . . provisions of the Constitution of the Commonwealth of Massachusetts, the Act of Separation and the Constitution of Maine, and the . . . decisions [upon which *Davis v. Scavone* relied] that we hold . . ." (149 Me. p. 195, 100 A.2d p. 428)

that the principle of the common law of England here invoked by defendant has al-ways been a part of the common law of this State.

We must, therefore, look upon the decision of the three-Justice panel as an abrogation of the existing common law of this State, and we hold that in so acting, the panel improperly exercised judicial power. In effect, it undertook to formulate a new public policy for the State of Maine in an area in which the delicacies of the balancing of values, the strongly held differing attitudes among segments of the populace and the potential for enormous impact upon the public welfare strongly point to the propriety of judicial restraint, and an acknowledgment that inadequacies, if any, in the common law as presently operative should be left to the Legislature to evaluate and remedy.

Cogently illustrative of the legal soundness and practical wisdom of this conclusion is the history of the American Law Institute's own undertaking to deal with the matter.

In its First (1934) Restatement of the Law of Torts the Institute saw fit to modify the common law principle by limiting the privilege of a police officer to use deadly force to effect an arrest to arrests

"for treason or . . . a felony which normally causes or threatens death or serious bodily harm, or which involves the breaking and entry of a dwelling place, . . .." 1 Restatement, Torts § 131

In the 1948 Supplement to the Restatement of Torts, however, the Institute decided to abandon its 1934 formulation of Section 131 and revise it to embody the common law principle that a police officer is privileged to use deadly force when necessary to effect an arrest for any felony.

---

1. This point is shown by the Court's resort in *Davis v. Scavone* to a Massachusetts case decided more than twenty years after Maine had become a separate State, namely, *Shelton v. Homer et al.,* 5 Met. (Mass.) 462 (1843).

The reason for the change is comprehensively explained at pp. 140 et seq. of the 1966 Appendix to the Second Restatement of Torts. Beyond the point made by Professor Prosser, as the Reporter in 1966, that the limitations in Section 131 of the First Restatement "had no direct authority to support it" and the then "Reporter (Professor Bohlen) [had] sought to support it by analogy . . ." (p. 141), highly significant for present purposes is the 1966 Reporter's description of the events which had transpired in 1931

"when the same problem came up . . . in connection with drafting a statute on the administration of criminal law . . . ." (p. 141)

At that time, the American Law Institute Council

"disapproved of a section designed to limit, by legislation, the scope of the common law privilege to kill a felon as it has already been limited in . . . [Section 131 of the Restatement of Torts (First)]."

Indeed,

"[t]he Institute expressed strong opposition to the proposed change, by legislation, and voted to return the draft to the Council to reconsider the whole subject." p. 141)

Summarizing the reaction of the Courts to the First Restatement's change of the common law principle, as such reaction had been manifested to and including 1966, Professor Prosser stated:

"No case has been found which has cited § 131 or which is in accord with it." (p. 142)

Professor Prosser's characterization of the essence of the matter was:

" . . . § 131 as originally worded stated a desirable rule of law, but

. . . the change [effected in 1948, to return to the common law formulation] is necessary in a Restatement of existing authorities. This is not a situation in which there is a split of authority. Every case which actually decides the question agrees that the original English common law is still the law." (p. 142)

Thus, to the extent that, through the medium of the Restatement of the Law, the American Law Institute has undertaken to guide judges in their judicial function of discerning and applying the existing law, the Institute left no doubt that the legal principle to control the case at bar should be the common law of England. See, further, 1 Restatement of Torts 2d, § 131. It was only when the American Law Institute was addressing itself to recommendations for appropriate *legislative* action, as was avowedly its undertaking in the formulation of the Model Penal Code, that the Institute saw fit to favor a different resolution of the public policy questions at stake.

Even among those preparing the tentative drafts of the Model Penal Code, there was strongly expressed controversy as to how the balance should be struck between the necessities of effective law enforcement and our society's dedication to the sanctity of human life. The discussion amply exposed that modification of the common law principle here under scrutiny is an undertaking fraught with so high a degree of sensitivity and potential gravity of consequences that the evaluation of all the factors involved, theoretical and pragmatic, is appropriately the function not of the judiciary but of the Legislature as the most directly responsible representatives of the people best equipped to act with the minuteness or expansiveness, the rigidity or flexibility desirable to mesh current law with current needs. At present, this is especially true since, currently, our societal needs tend to change rapidly because of the accelerating pace of technological advances and the varying tensions produced

by ever-increasing economic and sociological complexities.[2]

We discern in the reasons advanced to support abrogation of the common law principle here under discussion no anomaly, or emergency, in the administration of justice sufficient to require that the judiciary act forthwith rather than await legislative assessment of the competing values and interests and legislative determination of the appropriate balance to be struck among them.

That the theoretical rationale originally underlying the common law principle is obsolete fails, per se, to mandate a judicial repudiation of it. Other new conditions may have supervened to provide the principle with currently viable theoretical undergirding and which, therefore, suggest the wisdom of a legislative study of all the facets involved before the abandonment of the common law principle is undertaken. We emphasized this consideration in *Younie v. State,* Me., 281 A.2d 446, 451 (1971).

Similarly here,—notwithstanding, too, deficiencies of the "felony-misdemeanor" distinction adequately to distinguish the crimes dangerous to life and limb from those not so (since, as even proponents of the Model Penal Code legislative approach acknowledge,

"[n]o perfect principle of limitation can be formulated") [3]—

we are satisfied that it is more consonant with the appropriate function of the judiciary to await legislative decision upon whether, and, if so, the manner in which, there shall be modification of the principle of the common law upon which defendant here relies.

---

2. Those favoring the legislative changes in connection with Section 3.07 of the Tentative Draft of the Model Penal Code believed:

"Despite the difficulties . . . [we] deem the balance of advantage on the side of limiting the use of deadly force for the sole purpose of effecting an arrest. No perfect principle of limitation can be formulated. We think, however, that the principle proposed is valid and susceptible of practical administration—the more so since the officer, will, on the whole, be justified upon his own belief in the existence of the justifying peril. A challenge to that belief under Section 3.09 as reckless or negligent is likely to receive attention or prevail only in cases of extreme abuse, where deadly force was plainly indefensible under the criterion that we propose." Reprints—Tentative Drafts Nos. 8, 9, and 10, Model Penal Code, p. 63.

A contrary point of view was vigorously expressed by Professor Waite of the Advisory Committee as follows:

"I am convinced that only through truly effective power of arrest can law be satisfactorily enforced. Obviously until violators are brought before the courts the law's sanctions cannot be applied to them. . . . [E]ffectiveness in making arrests requires more than merely pitting the footwork of policemen against that of suspected criminals.

\*  \*  \*  \*  \*

" . . . [Section 3.04(2)(a)(i)] [of the Tentative Draft] denies a person being arrested any privilege of resistance; he must sacrifice his right of absolute freedom to the public necessities. I believe he should also be denied the privilege of flight. I would require not only his abstention from active resistance, but also the even easier abstention from flight. His preclusion from resistance is made effective by giving the officer authority to use whatever force is needed to overcome that resistance. I would make the preclusion from flight effective by giving the officer authority to utilize necessary force there also.

\*  \*  \*  \*  \*

" . . . [T]he danger to socially necessary effective law enforcement is undeniable. As I said at the Institute meeting twenty-five years ago [in addressing the same problem in connection with the drafting of a statute on the administration of criminal law]:

" . . . we say to the criminal, 'You are foolish. No matter what you have done you are foolish if you submit to arrest. The officer dare not take the risk of shooting at you. If you can outrun him, outrun him. . . . If you are faster than he is you are free, . . . .' I feel entirely unwilling to give that benediction to the modern criminal.

"That subsection was . . . [25 years ago] rejected by the meeting, and I believe would be rejected today by the great majority of people who are conversant with the difficulties of effective law enforcement." Id. pp. 60–62.

3. Reprint—Tentative Drafts Nos. 8, 9, and 10, Model Penal Code, p. 63.

The panel committed reversible error in refusing to take as the law governing this case the common law principle invoked by defendant. The appeal of the defendant must be sustained and the judgment of the Superior Court reversed.[4]

The opinion of the three-Justice panel observed that this case

"presents a unique set of circumstances in which . . . the court's review of the evidence finds . . ."

an absence of "factual disputes and that the sole question is a question of law." Hence, the panel concluded that although

"[o]rdinarily . . . [a] court is not inclined to resolve litigation of this type by means of summary judgment"

in the circumstances before it,

". . . summary judgment expeditiously and inexpensively achieves its designated purpose of resolving legal questions where there are no factual disputes."

These observations were made by the panel, however, as they were about to decide the case by the application of the factors embodied in Section 3.07(2)(b) of the Model Penal Code rather than by those of the common law principle we have held governing. Once attention must be refocused upon the content of the common law

principle, notwithstanding that there may be agreement as to the events which had occurred in fact, the *judgmental characterization* of the actual events, specifically whether the deadly force used was truly "necessary",—i. e., that "there was no other way the felon could be arrested"—was never explicitly addressed by the panel. We cannot say that the record before us settles this issue—basically, an ultimate mixed question of law and fact—so definitively that a tribunal would be irrational were it to disagree upon the answer.

There thus remains a legitimate "fact-finding" role yet to be played by the trial tribunal. Accordingly, although we sustain the appeal of the defendant and reverse the summary judgment in favor of the plaintiff, we cannot order the case remanded with instructions that summary judgment be entered in favor of the defendant. The remand must be, rather, for further proceedings in the Superior Court in accordance with this opinion.

The entry is:

*Appeal sustained.*

*Case remanded to the Superior Court for further proceedings in accordance with the opinion herein.*

All Justices concurring.

DELAHANTY, J., did not sit.

4. The 107th Maine Legislature (1975) enacted a new Criminal Code for Maine in which the concepts of "felony" and "misdemeanor" were eliminated. The Legislature was, therefore, obliged to deal with the kind of problem now before us other than the common law approach. In Chapter 5, Section 107(2) the new Maine Criminal Code provides:

"A law enforcement officer is justified in using deadly force only when he reasonably believes such force is necessary:
"B. To effect an arrest . . . of a person whom he reasonably believes
(1) has committed a crime involving the use or threatened use of deadly force, or is using a deadly weapon in attempting to escape, or otherwise indicates that he is likely seriously to endanger human life or

to inflict serious bodily injury unless apprehended without delay; and
(2) he had made reasonable efforts to advise the person that he is a law enforcement officer attempting to effect an arrest and has reasonable grounds to believe that the person is aware of these facts."

The Legislature elected to make this change of the common law effective on the same date as the entirety of the Code is to take effect, March 1, 1976, in that the Legislature did not see fit to except it from the general governing provisions of Chapter I, Section 1(2) that:

" . . . Prosecution for crimes committed prior to the effective date shall be governed by the prior law which is continued in effect for that purpose as if this code were not in force; . . .."