Christine MAIORANA, as the Administratrix of the Estate of Anthony C. Maiorana, Plaintiff-Appellant,

v.

Robert D. MacDONALD and Robert Scire, Defendants-Appellees.

Christine MAIORANA, as the Administratrix of the Estate of Anthony C. Maiorana, Plaintiff-Appellant,

v.

James JAJUGA, Robert J. Long, and Ronald Guilmette, Defendants-Appellees.

Nos. 78–1424, 78–1425.

United States Court of Appeals, First Circuit.

Argued Jan. 4, 1979.

Decided April 18, 1979.

Jeffrey M. Kaye and Raymond C. Malloy, with whom Struffolino, Malloy & Kaye, Methuen, Mass., were on brief, for plaintiff-appellant.

Joseph W. Monahan, III, Boston, Mass., for defendant-appellee Robert Scire.

Edward J. Duggan, Sp. Asst. Atty. Gen., with whom Chester R. McLaughlin, Sp. Asst. Atty. Gen., was on brief, for defendants-appellees James Jajuga, Robert J. Long and Ronald Guilmette.

Carolyn Grace, Asst. U.S. Atty., Boston, Mass., with whom Edward F. Harrington, U.S. Atty., Boston, Mass., was on brief, for defendant-appellee Robert D. MacDonald.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

BOWNES, Circuit Judge.

The plaintiff is the mother of Anthony C. Maiorana who was shot and killed in the course of an arrest on February 15, 1974, by local, state and federal law enforcement officers. As administratrix of her son's estate, she brought two actions for damages under 42 U.S.C. § 1983 and the fourth amendment to the United States Constitution.[1] The first complaint was filed against

---

[1] The basis of the fourth amendment claim against federal agent MacDonald is attenuated at best: plaintiff alleged in her original complaint that the intended arrest of Maiorana was unlawful. The precise basis of this claim against MacDonald was that the imminent arrest was purportedly for Maiorana's armed robbery of a Friendly ice cream store, a state

Massachusetts State Police Officers James Jajuga, Robert J. Long, and Ronald Guilmette; the second, against Robert D. MacDonald, a special agent of the Federal Bureau of Alcohol, Tobacco, and Firearms, and Robert Scire, a Woburn police officer. The district court granted summary judgment for all defendants, which ruling is challenged on appeal.

The plaintiff's claim is a serious one: that the defendants acted with gross negligence, bad faith, and excessive force in killing her son while attempting to arrest him.[2] There is no question that she has stated a cause of action, even though it is unclear whether she also contends that there was no probable cause to arrest her son.[3] *Williams v. Liberty*, 461 F.2d 325, 327 (7th Cir. 1972); *Jenkins v. Averett*, 424 F.2d 1228, 1232 (4th Cir. 1970); *Delaney v. Dias*, 415 F.Supp. 1351, 1353 (D.Mass.1976).

 In answering the complaints, all defendants claimed qualified immunity for their actions. The defense of qualified immunity, which is available to local, state, and federal law enforcement officers, protects the defendants from liability for damages if they acted with a good faith belief based upon reasonable grounds that the measures they took were necessary. *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978); *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967).

All of the defendants, either expressly or impliedly, also contended that their actions were fully justified. They further asserted that the plaintiff's actions for violation of her son's civil rights did not survive his death.

In moving for summary judgment or dismissal, the defendants each filed affidavits of their own, along with affidavits from Agent Henry Foderaro of the Bureau of Alcohol, Tobacco, and Firearms, the doctor who performed the autopsy, and a state police ballistician. The plaintiff filed three counteraffidavits. Except for memoranda of law, no further materials were filed.

The defendants' affidavits, which are, in the main, uncontradicted, establish the following facts. Jajuga first met Maiorana in January, 1973, while investigating narcotics violations in the Lowell area. From Maiorana, he received information that led to some arrests and prosecutions. On February 12, 1973, he, along with two Lawrence police officers, arrested Maiorana at his home for an armed robbery while masked. According to Jajuga's affidavit, during the arrest Maiorana reached under a pillow for a revolver, but was prevented from getting it by one of the officers grabbing his hand. This was contradicted by plaintiff, who, in one of her affidavits, stated that at the time of the arrest she was standing in the doorway and that Jajuga asked her son where the gun was, that her son told him the gun was under the pillow and that Jajuga then reached over and took it.[4]

offense. Plaintiff argues that, since MacDonald was a federal agent, he had no authority to be involved in arrest for a state offense. We think this argument strains the outer parameters of the federal rules' mandate to give a liberal reading to complaints and all reasonable inferences drawn therefrom. However, since it is unclear whether plaintiff also claimed that the proposed arrest would have been made without probable cause, we read the complaint as properly, albeit marginally, stating a claimed violation of the fourth amendment. Since we affirm the district court's judgment for defendant, we need not and do not reach the question of whether the facts alleged herein could underpin a constitutional tort premised on *Bivens*.

**2.** On appeal, the plaintiff has abandoned her even more serious allegation that the state po-

lice defendants conspired to kill her son, who she said had been an informant, but had threatened to cease such activity and expose illegal activities by the police. The plaintiff's brief focussed on the claim that the police had been grossly negligent in effecting her son's arrest. At oral argument, her counsel expressly disavowed any claim that the deceased was deliberately "set up" and murdered and relied on gross negligence and/or recklessness in the arrest to establish liability.

**3.** See n. 1, *supra*.

**4.** After the arrest, Maiorana was bound over for the next term of the grand jury. No further explanation is given as to why he was not in custody during the events which concern us.

Jajuga last received information from Maiorana in November, 1973, had no subsequent contact with him, and did not participate in the events leading to the attempt to arrest him on February 15, 1974.

In January and February, 1974, MacDonald was investigating illegal firearms traffic in the Woburn area. Agent Foderaro informed MacDonald that, while under cover, he had purchased a gun from Maiorana. On advice of Foderaro, MacDonald contacted Long, who was also conducting a firearms trafficking investigation with Guilmette and was planning to obtain a search warrant for the apartment where Maiorana obtained the gun sold to Foderaro. Long and Guilmette had the cooperation of William Callagy and Stephen Fleischman. Long's affidavit states that Callagy told him that many guns were being sold illegally in Lawrence, that his girl friend had received numerous phone calls threatening her life and the lives of her two children, that Maiorana, who carried a .357 Magnum, was the main source of the guns in Lawrence and that he obtained them from a person named Dave who lived in Woburn and drove a taxi. Long had discussed this information with Scire, who was able to fully identify the Woburn source as one David Wells. Neither Long, Guilmette nor Scire knew Maiorana personally.

A search warrant was obtained for Wells' apartment on February 12, 1974. It was not executed, as anticipated, on February 13 because Maiorana failed to contact the undercover agent who had arranged to buy a gun there.

On February 14, 1974, Guilmette and Long learned that Maiorana was going to sell Callagy some guns at the apartment, and the officers planned to execute the warrant upon a signal from Callagy who was fitted with an electronic listening and signalling device. The signal was not given, however, because there were no guns in the apartment when Callagy, Fleischman, and Maiorana went there.

Callagy informed Guilmette about 10:30 in the evening of February 14 that Maiorana had told him and Fleischman that he had robbed Friendly's ice cream store in Woburn and a taxi stand. The officers knew the store had been robbed at 7:30 P.M. by a man meeting Maiorana's description and carrying a large hand gun. Long was informed on the morning of February 15 by Guilmette that Maiorana had phoned Callagy that morning and told him that the guns could be bought that day and that he would meet Callagy at Wells' apartment about noon. Long met with the other officers involved and Callagy and Fleischman in the parking lot of the Woburn Police Department about noontime. Callagy and Fleischman were introduced to the others and the plan for the execution of the warrant and the arrest was outlined. Both Callagy and Fleischman told the officers that Maiorana had a .357 Magnum and had told them that the reason he carried it was to give him the edge on any cop (since the police only had .38 revolvers) and had stated that he was not going to be taken alive. They also said that Maiorana had shown them a secret place in his jacket with a special hole in it from which he could fire the Magnum without opening the jacket. They told the officers that they thought Maiorana was crazy and they were afraid of being caught in a cross-fire in the event of a shoot-out. MacDonald stated in his affidavit that Long told him that Maiorana was too dangerous to be out on the street and that if he were not arrested, he would kill someone. The officers also knew that Maiorana was a drug user and had a prior criminal record.

After the parking lot meeting, Callagy and Fleischman went to meet Maiorana at Wells' apartment. They were still equipped with the electronic device and were to give a signal if there were guns at the apartment, but there were none. MacDonald's affidavit stated that he listened to what went on in the apartment via the "bug." MacDonald heard the three go to their car, heard Maiorana leave the car and return and heard one of the informants ask Maiorana if he had gone back for his gun, to which Maiorana replied that he had. Maiorana was observed leaving the apartment with a .357 Magnum in his belt and

getting into the back seat of the car which Callagy drove with Fleischman as a front seat passenger. As the car approached the intersection of Montvale Avenue and Washington Street, it stopped for a traffic light in heavy traffic. The officers who had been following the car had radioed ahead for another cruiser, which they learned was manned by a young and .inexperienced trooper. Not wishing to involve him and hoping to take Maiorana by surprise, they decided that, if the traffic light turned red again, after turning green, and Callagy's car was still stopped, they would arrest Maiorana immediately. Callagy's car was halted again by a change of lights and the arrest attempt was made.

Approaching the car from behind, Long and Guilmette went to the passenger side, and MacDonald and Scire went to the driver's side. All had their guns drawn, displayed police identification, and shouted warnings not to move. Long reached into the back seat and attempted to restrain Maiorana's hands. A shot was fired and Long was hit. MacDonald heard Long exclaim, "I am hit," or words to that effect. He saw movement in the back seat and fired three times. Scire's affidavit stated that he fired a single shot after seeing Maiorana reach for his waist. Guilmette stated that he shot from a crouched position after realizing that Long had been hit and seeing Maiorana use his left hand to grip the butt of the gun he had in his belt. Scire ran around the car to assist Long. Both Maiorana and Long were taken to the hospital where Maiorana died. The parties now agree that Scire's shot hit Long, Guilmette's shot hit Maiorana in the thigh, and one of MacDonald's three shots killed Maiorana by piercing his lung and aorta.

After making findings well within the compass of the affidavits, the court went on to rule that the plaintiff's actions survived her son's death. Next, it concluded that there was no genuine dispute concerning the reasonableness and good faith of the

officers, who the court found had grounds to believe that Maiorana was armed and dangerous and who were called upon to act decisively under the circumstances. The court characterized the plaintiff's counteraffidavits as "mostly conclusory allegations . . . [about] the state of mind of the officers . . . [and] a speculative, unsupported and self-serving analysis of the circumstances surrounding the arrest." It found no competent evidence to create a material issue of fact as to the reasonable belief and good faith of the officers.[5]

In deciding whether the district court properly granted summary judgment, we are guided by Fed.R.Civ.P. 56 and the principles discussed in *Hahn v. Sargent*, 523 F.2d 461 (1st Cir. 1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 54 (1976). We must determine whether the defendants, as the moving parties, affirmatively demonstrated that there was "no genuine issue as to any material fact." Rule 56(c). In doing so, we view the record " 'in the light most favorable to . . . the party opposing the motion,' " *Hahn, supra*, at 464, quoting *Poller v. Columbia Broadcasting System*, 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), and "indulge all inferences favorable to the party opposing the motion." *Hahn, supra*, at 464, *citing United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). We are also required to consider whether the plaintiff's counteraffidavits conformed to Rule 56(e), which states in pertinent part:

Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to all matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith.

We are well aware, as was the district court, that cases like this one in which state of mind is at issue do not usually lend

---

5. This ruling applied not only to the plaintiff's claim that the defendants used excessive force in arresting her son, but also to her conspiracy to murder claim and her claim as to gross negligence by the defendants in supplying her son with guns and drugs.

themselves to summary judgment. *Poller v. Columbia Broadcasting System, supra,* 368 U.S. at 473, 82 S.Ct. 486; *Gual Morales v. Hernandez Vega,* 579 F.2d 677, 680–81 (1st Cir. 1978); 10 Wright and Miller, Federal Practice and Procedure: Civil § 2730 (1973). In *Hahn,* where state of mind was at issue, while upholding summary judgment, we indicated that "great circumspection is required" in such circumstances and a trial is appropriate as long as the party opposing summary judgment has given "some indication that he can produce the requisite quantum of evidence to enable him to reach the jury with his claim." *Hahn v. Sargent, supra,* 523 F.2d at 468.

Nevertheless, we cannot ignore the Supreme Court's clear statement that government officials raising immunity defenses to damage suits may properly be awarded summary judgment. In recognizing qualified immunity for most federal officials, the Court recently said:

> [D]amage suits concerning constitutional violations need not proceed to trial, but can be terminated on a properly supported motion for summary judgment based on the defense of immunity. See [*Scheuer v. Rhodes*] 416 U.S., at 250 [94 S.Ct., at 1693]. In responding to such a motion, plaintiffs may not play dog in the manger; and firm application of the Federal Rules of Civil Procedure will ensure that federal officers are not harassed by frivolous lawsuits.

*Butz v. Economou, supra,* 438 U.S. at 508, 98 S.Ct. at 2911.[6] In *Scheuer,* a § 1983 action brought against various state officials by the estates of students killed at Kent State University, the Court had required further proceedings on the issue of good faith "either by way of summary judgment or by trial on the merits." *Scheuer v. Rhodes, supra,* 416 U.S. at 250, 94 S.Ct. at 1693. *See also Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978), where summary judgment was upheld for state prison officials asserting qualified immunity for interference with prisoners' mail.

■ There are two competing considerations bearing on whether summary judgment should be granted in civil rights cases where qualified immunity is asserted. The traditional reluctance to grant summary judgment in cases involving state of mind issues (such as good faith) is counterbalanced by the desirability of screening out frivolous actions through the summary judgment filter so as not to discourage officials from taking necessary and decisive action. *See Butz v. Economou, supra,* 438 U.S. at 496 and 506, 98 S.Ct. at 2906 and 2911.

It is with this perspective that we determine whether the defendants were entitled to summary judgment.

■ We have the least difficulty concluding that summary judgment was properly awarded Jajuga. Jajuga could not be held liable under § 1983 unless he had some personal role in Maiorana's death. *Kostka v. Hogg,* 560 F.2d 37, 40 (1st Cir. 1977). According to the undisputed facts, he did not participate in the investigation that led to the attempted arrest of Maiorana and was not present when Maiorana was shot.

Furthermore, although one of the plaintiff's counteraffidavits sharply contradicted some of Jajuga's sworn statements, it failed to establish the existence of a genuine and material factual issue concerning his liability. The dispute centered on whether Jajuga had supplied Maiorana with guns, money, and drugs when Maiorana was acting as his informant—an issue that had no direct bearing on Jajuga's involvement in the fatal shooting of Maiorana. There was further disagreement as to whether Jajuga threatened Maiorana when he said he no longer wanted to be an informant, but there was nothing solid in the plaintiff's counteraffidavit to link this alleged threat

---

**6.** This statement expressly contravened the minority view, which was that summary judgment would rarely be appropriate in an action in which the central issue was an official's state of mind. *Butz v. Economou,* 438 U.S. 478, 526, 98 S.Ct. 2894, 2921, 57 L.Ed.2d 895 (1978).

to the actions of those who participated in the fatal shooting.[7]

By asserting in her brief that "[Jajuga's] actions in supplying Maiorana with drugs, money and guns may have contributed to the circumstances bringing about [Maiorana's] death," the plaintiff has attempted "to build a case on the gossamer threads of whimsy, speculation and conjecture." *Manganaro v. Delaval Separator Co.*, 309 F.2d 389, 393 (1st Cir. 1962). Even if Jajuga had engaged in the misconduct alleged by the plaintiff, there was no indication that it brought about the shooting of Maiorana by the others. *Cf. Palmer v. Hall*, 517 F.2d 705, 708–19 (5th Cir. 1975) (judgment against mayor reversed for insufficient evidence that his "shoot to kill" statements caused a police officer to shoot the plaintiff). In the absence of a genuine issue as to Jajuga's involvement in the shooting, summary judgment was warranted. *See Simms v. Reiner*, 419 F.Supp. 468, 474–75 (N.D.Ill.1976); *Richardson v. Snow*, 340 F.Supp. 1261, 1262–63 (D.Md.1972) (police chiefs not involved in shootings held entitled to summary judgment). *Cf. Kostka v. Hogg, supra*, 560 F.2d at 40–41; *Delaney v. Dias, supra*, 415 F.Supp. at 1353–55 (police chiefs held entitled to dismissals due to insufficient allegations of their involvement in subordinates' misconduct).

A more difficult question is whether summary judgment should have been granted Long, Guilmette, Scire, and MacDonald. All participated in the events leading up to and including the fatal shooting. Their affidavits indicate that Long took the lead and chose the moment of arrest. Each of the others, by his own admission, fired his gun at the decedent.

■ In addressing the liability of these defendants, we bear in mind that "police officers . . . must often act swiftly and firmly at the risk that action deferred will be futile or constitute virtual abdication of office." *Scheuer v. Rhodes, supra*, 416 U.S. at 246, 94 S.Ct. at 1691. We also recognize that an arrest may sometimes entail the use of deadly force and that liability under § 1983 will not arise if the officers involved reasonably believed in good faith that such force was necessary to protect themselves or others from death or great bodily harm. *See, e. g., Clark v. Ziedonis*, 513 F.2d 79, 81 (7th Cir. 1975); *Willis v. Tillrock*, 421 F.Supp. 368, 370–72 (N.D.Ill.1976). *See generally, Butz v. Economou, supra*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895; *Pierson v. Ray, supra*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288. *See also Hebah v. United States*, 456 F.2d 696, 709, 197 Ct.Cl. 729 (1972), *cert. denied*, 409 U.S. 870, 93 S.Ct. 199, 34 L.Ed.2d 121; *Commonwealth v. Young*, 326 Mass. 597, 601–02, 96 N.E.2d 133, 135 (1950).

■ At the time Maiorana left the apartment with Callagy and Fleischman, all officers knew that he was armed with a .357 Magnum, they had been reliably informed that he carried this gun to get an edge on the police and that he could fire it without drawing it entirely out of his jacket. They also had been reliably informed that when arrested the previous year Maiorana had gone for a gun hidden under a pillow. They knew he had a prior criminal record and was a drug user. Based upon all the information the defendants had, they would have been extremely naive to believe that arresting Maiorana was going to be easy or routine. While it might be argued that the defendants overreacted, this is purely Monday morning quarterbacking.

We agree with the district court that the affidavits lead inexorably to the conclusion

---

7. For example, the allegation that, on the evening before he was shot, Maiorana told the plaintiff that he was afraid police were going to kill him did not specifically connect Jajuga to the shooting. And, as noted at n. 2, *supra*, the plaintiff is no longer pressing her conspiracy to murder claim.

Further allegations that Jajuga warned Long to be careful of Maiorana and gave him Maior-

ana's picture do not appear to be based on the plaintiff's personal knowledge, as required by Rule 56(e). Even if they were, they would not appreciably advance the plaintiff's case against Jajuga, in light of the ample information the officers at the scene had from other sources that Maiorana was armed and dangerous.

that the defendants acted "out of a sense of public duty without malice and in good faith to effect the safe apprehension of Maiorana." On the defendants' version of the facts, we find no issue as to their reasonableness or good faith and no possible basis for a judgment holding them liable. See *Brubaker v. King*, 505 F.2d 534, 538–39 (7th Cir. 1974). Compare *Jaroslawicz v. Seedman*, 528 F.2d 727, 732 (2d Cir. 1975).

The next and crucial question, therefore, is whether the plaintiff's counteraffidavits raised a genuine issue of fact as to the officers' reasonable belief and good faith. See *Tristis v. Backer*, 501 F.2d 1021, 1024 (7th Cir. 1974); *Strutt v. Upham*, 440 F.2d 1236, 1237 (9th Cir. 1971). It is clear, as the district court found, that they did not.

The pertinent portions of the plaintiff's counteraffidavits are set forth in the margin.[8] The principal assertions in them are that (1) Long knew Maiorana could have been arrested, unarmed, earlier on the 15th, (2) after shooting Long, Scire holstered his gun and went to Long's aid, and Guilmette and MacDonald observed this before shooting, and (3) MacDonald's fatal shot hit Maiorana one and one-half inches under the left armpit without striking his arm.

As the defendants correctly point out, the critical portions of the counteraffidavits do not comply with Rule 56(e).[9] The

---

8. The counteraffidavit submitted against Long said, in part:

> Trooper Long ` . . . knew that during that same morning my son was walking the streets of Woburn, to a diner and a barbershop, unarmed, and under surveillance by his men, was not dangerous, could have been safely arrested during these few hours, but chose not to do so. There would have been no risk of 'death or serious bodily harm' during this period. Instead he waited until my son made a last minute trip back into the house for a gun and then followed several miles in traffic until they had placed my son in a dangerous condition, then allowed excessive force to be used while apprehending my son.
>
> . . . Where the shooting that took place it is a busy intersection, he cannot maintain that he was faithfully performing his duties to protect the public.

The counteraffidavit submitted against MacDonald and Scire said, in part:

> Agent MacDonald states in paragraph 19 of his affidavit that he was about even with the driver (of Maiorana car) when he heard a shot, and heard Trooper Long say he was shot.
>
> This could not be so, as Officer Scire testified at the inquest into the death of my son that he, (Scire) reached the car on that side, at the same time Long opened the door on passengers' side. He further testified that MacDonald was behind him, following him to driver's side. When he (scire) reached the driver's side, he opened the door, pushed the front seat forward (with the driver still in it) claimed he saw a movement in the back seat of the car and fired one shot (at the movement) hitting Trooper Long who fell back out of the car, crying that he was hit.
>
> Officer Scire then testified that he holstered his gun, then ran around the car to assist Long, who he knew he shot. He did not bump into MacDonald (who"s testimony was that he was a step behind Scire on the way to the car). He did not even see MacDonald during this period.
>
> MacDonald, however must have seen Scire and his actions. It was plain to him that Scire had shot into the car, then showed no further interest in shooting again, or even holding his pistol pointed into the car but had holstered it and ran or was running around the car.
>
> It was then MacDonald shot my son.
>
> The autopsy (testified to at the inquest in my presence) showed that my son was hit in the left armpit without his arm being hit, showing that his arms were raised high in surrender, and that it was MacDonalds third shot that killed him.
>
> There was clearly no reason for MacDonald to shoot.
>
> The shot that killed my son, entered one and one-half inches below the left armpit, one half inch below the seams on his clothing, as was testified to at the inquest.
>
> MacDonald does not mention that after Scire shot, from a 'scrunched down' position (as he testified) that he then stood up holstered his gun and ran around the other side of the car to assist Long, at which time Trooper Guilmette shot Maiorana in the thigh from the driver's side, all this activity before MacDonald shot, and clearly without reasonable justification or probable cause (original punctuation).

9. The plaintiff suggests that the defendants waived this objection by failing to file timely motions to strike. Nevertheless, at least one defendant (MacDonald) objected in writing to the counteraffidavits. Furthermore, the district court itself noted the defects and disregarded the counteraffidavits. In these circumstances, we see no reason to ignore the plaintiff's noncompliance with Rule 56(e). Compare

defects are numerous. To begin with, the plaintiff's statements were not made "on personal knowledge" since she did not witness the events of the 15th. *Hahn v. Sargent, supra,* 523 F.2d at 466–67. *See Chan Wing Cheung v. Hamilton,* 298 F.2d 459, 460 (1st Cir. 1962). *See generally Automatic Radio Manufacturing Co. v. Hazeltine Research, Inc.,* 339 U.S. 827, 831, 70 S.Ct. 894, 94 L.Ed. 1312 (1950). They were, instead, purportedly based upon testimony she heard at an inquest[10] and on an autopsy report. Yet, sworn or certified copies of the transcript of the inquest and the autopsy report were not, as required, attached to her counteraffidavits or served with them. *Washington Post Co. v. Keogh,* 125 U.S. App.D.C. 32, 38, 365 F.2d 965, 971 (1966), *cert. denied,* 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967). In addition, to the extent that the plaintiff was repeating statements made by others, she was apparently relying upon hearsay—inadmissible evidence to which she would not be competent to testify. *Broadway v. City of Montgomery, Alabama,* 530 F.2d 657, 661 (5th Cir. 1976). Particular portions of the counteraffidavits were improper because they purported to examine the defendants' thoughts as well as their actions.[11] *Hahn v. Sargent, supra,* 523 F.2d at 466. Other portions contained impermissible speculation or conclusory language.[12] *Applegate v. Top Associates, Inc.,* 425 F.2d 92, 96–97 (2d Cir. 1970). *See Feldman v. Birger,* 205 F.Supp. 87, 90 (D.Mass.1962).

The plaintiffs' efforts to salvage her counteraffidavits on appeal do not impress us. First, she appears to argue that she should be excused for her failure to append or serve the inquest transcript. Nevertheless, the mandatory language of Rule 56(e)

and the weight of authority are to the contrary. 6 Pt. 2, Moore's Federal Practice ¶ 56.22[1] at 1328 (2d ed. 1976), and cases cited at n.53. *But see Washington v. Johns-Manville Corp.,* 259 F.Supp. 440, 458 (E.D. Pa.1966). We do not see why, even if the transcript was bulky, the relevant portions could not have been properly presented, or the transcript at least proffered in the district court. *Whitaker v. Coleman,* 115 F.2d 305, 307 (5th Cir. 1940).

█ The plaintiff argues that her counteraffidavits were legally sufficient insofar as they summarized inquest testimony which was given by the defendants in her presence and in which the defendants made statements inconsistent with their affidavits. There is authority suggesting that affidavits containing such information fall within an exception to the hearsay rule and sufficiently comply with Rule 56(e). *Corley v. Life and Casualty Insurance Co. of Tennessee,* 111 U.S.App.D.C. 327, 328–29, 296 F.2d 449, 450–51 (1961); *Douglas v. Beneficial Finance Co. of Anchorage,* 334 F.Supp. 1166, 1169–70 (D.Alaska 1971). This authority does not aid the plaintiff, however, because the counteraffidavits do not pose any material discrepancies between the inquest testimony and the affidavits given by any of the defendants.

Finally, the plaintiff urges that affidavits filed by a party opposing summary judgment have been treated with more indulgence than those of the moving party. 6 Pt. 2, Moore's Federal Practice, *supra,* at 1333–34, and cases cited at nn.64 and 65; 10 Wright and Miller, Federal Practice and Procedure: Civil § 2738 at 708–09 (1973), and cases cited at n.61. Applying this approach here would conflict to some extent

---

*Lacey v. Lumber Mutual Insurance Co. of Boston,* 554 F.2d 1204, 1205 (1st Cir. 1977); *Noblett v. General Electric Credit Corp.,* 400 F.2d 442, 445 (10th Cir. 1968), *cert. denied,* 393 U.S. 935, 89 S.Ct. 295, 21 L.Ed.2d 271 (no objection raised below to affidavits considered by the district court).

10. According to the amended answer filed by the state police officers, the inquest resulted in a determination of justifiable homicide.

11. For example, "Long . . . knew" and "[i]t was plain to [MacDonald]."

12. For example, "Long . . . allowed excessive force to be used"; "the autopsy . . . showed that my son was hit in the left armpit without his arm being hit, showing that his arms were raised high in surrender"; "[t]here was clearly no reason for MacDonald to shoot."

with the Supreme Court's admonition that, when government officials are sued, the rules concerning summary judgment should be given "firm application." *Butz v. Economou, supra,* 438 U.S. at 508, 98 S.Ct. at 2911. Even so, we might be inclined toward leniency had there been some clear sign the plaintiff could have defeated summary judgment with properly drafted counteraffidavits. There was not.

Even if the plaintiff had somehow shown that Long knew Maiorana could have been arrested earlier while unarmed, we do not think a trial would have been required. The timing of the arrest was primarily geared to the firearms trafficking investigation. The police cannot be faulted for hoping to get two birds with one stone. They started out on the morning of the 15th hoping to seize a supply of illegal firearms and to arrest Maiorana. The delay, even if intentional, did not create an issue as to the officer's reasonable belief or good faith.

Nor, do we believe, would evidence that Guilmette and MacDonald observed Scire holster his gun and go to Long's aid after shooting him have made any difference. We do not agree with the plaintiff's suggestion that this would cut against a finding that the officers reasonably believed in good faith that they were still in danger from Maiorana. It could just as well have meant that Scire felt Maiorana could be handled by Guilmette and MacDonald.

We cannot agree with the plaintiff that the statement in one of her affidavits that the bullet that killed her son entered under his left armpit created an issue of material fact because it showed that he was shot while his arms were raised to surrender. This is a pretty shaky inference. Maiorana could just as well have been in the act of drawing his weapon or moving his arm to do so. Such evidence does not in any way contradict MacDonald's sworn statement that he saw movement before shooting or create an issue as to whether he reasonably believed in good faith that deadly force was necessary. There was no way that there could have been testimony to the contrary if there were a trial. This is clearly not the type of situation where the physical facts themselves create an issue, as, for instance, if Maiorana had been shot in the back.

To summarize, the critical portions of the plaintiff's counteraffidavits have such glaring and pervasive defects that we are obliged to give them little weight, but, even if we considered them as in full compliance with the rule, we do not feel they would prevent summary judgment. *See Tritsis v. Backer, supra,* 501 F.2d at 1024; *Strutt v. Upham, supra,* 440 F.2d at 1237.[13]

Because of our decision that summary judgment was properly granted to all defendants, we do not reach the question whether the plaintiff's civil rights actions survived her son's death.

*Affirmed.*

---

**13.** The cases cited by the plaintiff in which summary judgment for arresting police officers was denied do not persuade us otherwise. In *Shifrin v. Wilson,* 412 F.Supp. 1282 (D.C.Cir. 1976), the officer who ordered the plaintiff's arrest under an unconstitutional regulation did not argue with any consistency and clarity that he acted with a reasonable belief and good faith. *Id.* at 1295–96. In *West v. Wheatley,* 313 F.Supp. 656 (D.Del.1970), differing inferences could have been drawn on the issues whether the defendant had reasonable grounds to arrest for a felony and used unreasonable force in killing the person arrested; the defense of qualified immunity does not appear to have been raised. Both cases contained broad language hostile to summary judgment which may be inconsistent with the approach taken by the Supreme Court in *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), and *Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978).